UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BURTON RICHTER, an individual; LINDA COLLINS CORK, an individual; GEORGIA L. MAY, an individual; THOMAS MERIGAN, an individual; ALFRED SPIVACK, an individual; and JANICE R. ANDERSON, an individual; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CC-PALO ALTO, INC., a Delaware corporation; CLASSIC RESIDENCE MANAGEMENT LIMITED PARTNERSHIP, an Illinois limited partnership; and CC-DEVELOPMENT GROUP, INC., a Delaware corporation,<br><br>Defendants. | Case No. 5:14-CV-00750-EJD<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**<br><br>**[Re: Dkt. Nos. 13, 20, 21]** |

Plaintiffs Burton Richter, Linda Collins Cork, Georgia L. May, Thomas Merigan, Alfred Spivack, and Janice R. Anderson (collectively, "Plaintiffs") bring this putative class action suit against Defendants CC-Palo Alto, Inc. ("CC-PA"), Classic Residence Management Limited Partnership ("CRMLP"), and CC-Development Group, Inc. ("CC-DG") (collectively, "Defendants"). Presently before the court is Defendants' Motions to Dismiss Plaintiffs' Class Action Complaint ("Complaint"). Having reviewed the parties' papers and heard oral argument, Defendants' motions are GRANTED for the reasons stated below.

Case No. 5:14-CV-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

## I. BACKGROUND

Plaintiffs are senior citizens who live at the Vi at Palo Alto ("the Vi")—a retirement community in Palo Alto, California. Compl. at ¶¶ 1, 43. The proposed class consists of all individuals who resided at the Vi between January 1, 2005 and the present. Id. at ¶ 2. Defendant CC-PA is the entity that owns and operates the Vi, and Defendant CC-DG (or CC-Chicago) is CC-PA's corporate parent. Id. at ¶ 3. To live at the Vi, Plaintiffs enter into a Continuing Care Residency Contract ("Residency Contract") with CC-PA. Id. at ¶¶ 4, 45. Plaintiffs must also pay an entrance fee, ranging from $745,500 to $4,620,800, and monthly fees, ranging from $4,320 to $9,320, depending on the type of apartment occupied. Id. at ¶ 50.

The entrance fees are loans to CC-PA, a repayable portion of which is to be repaid to Plaintiffs' heirs or estate after they pass away, or directly to Plaintiffs after the sale of their apartments at the Vi. Id. at ¶¶ 47-50. Since the Vi's opening in 2005, Plaintiffs have collectively loaned Defendants over $450 million in entrance fees. Id. at ¶ 5. Plaintiffs allege that, without their knowledge, CC-PA collected entrance fees and transferred over $190 million of that money to CC-DG without obtaining security or any repayment promise. Id. at ¶ 7. Consequently, CC-PA allegedly does not have enough money to refund the loans when they become due, and CC-DG disavows any obligation to do so. Id. at ¶¶ 7-8. Plaintiffs contend that continuing care retirement communities, such as the Vi, are required by California law to maintain reserves acting as security for the entrance fees. Id. at ¶¶ 6, 51. CC-PA allegedly now has a deficit of over $300 million and owes Plaintiffs over $450 million. Id. at ¶¶ 9, 58.

Plaintiffs also allege that the monthly fees they pay have been artificially inflated due to three improper charges levied by Defendants. Id. at ¶ 10. First, CC-PA has been assessed an increased property tax by the Santa Clara County Tax Assessor based on its "entrepreneurial profit" from the transfer of over $174 million to CC-DG, and CC-PA has stated that it will pass these taxes to Plaintiffs in the form of higher monthly fees. Id. at ¶¶ 11, 63-68. Prior to the assessment, CC-PA returned operating surplus to residents, but since then, no surplus has been returned. Id. at ¶ 66 n.5. Second, Defendants have allegedly improperly allocated earthquake

2
Case No. 5:14-CV-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

insurance premiums to Plaintiffs, even though under the terms of the Residency Contract, Plaintiffs should not incur insurance charges attributable to anything other than furniture, fixtures, and equipment. Id. at ¶¶ 12, 69-73. Third, Defendants have allegedly improperly charged Plaintiffs for "marketing costs," which were ostensibly incurred for promoting the Vi, but instead funded CC-DG's national marketing program. Id. at ¶¶ 13, 74-75.

Plaintiffs commenced the instant action on February 19, 2014, and allege the following claims: (1) concealment; (2) negligent misrepresentation; (3) breach of fiduciary duty and constructive trust; (4) financial abuse of elders in violation of California Welfare and Institutions Code §§ 15600, et seq.; (5) violation of the California Consumer Legal Remedies Act, California Civil Code §§ 1750, et seq.; (6) violation of California Business and Professions Code §§ 17200, et seq.; and (7) breach of contract. See Dkt. No. 1. In March 2014, Defendants filed their Motions to Dismiss. See Dkt. Nos. 13, 20, 21. Plaintiffs filed an opposition brief, and Defendants filed a reply brief. See Dkt. Nos. 29, 31. Oral argument was held on September 9, 2014.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). Moreover, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Twombly, 550 U.S. at 556-57.

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). The court must generally accept as true all "well-pleaded factual

3

Case No. 5:14-CV-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

allegations." Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009). The court must also construe the alleged facts in the light most favorable to the plaintiff. Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1988). However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). But "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

**B.     Motion to Dismiss for Lack of Subject Matter Jurisdiction**

A party may file a motion to dismiss with the Court for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal courts are courts of limited jurisdiction, adjudicating only cases which the Constitution and Congress authorize. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). An Article III federal court must ask whether a plaintiff has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III of the U.S. Constitution. To satisfy Article III standing, a plaintiff must allege: (1) an injury in fact that is concrete and particularized, as well as actual and imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely (not merely speculative) that the injury will be redressed by a favorable decision. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–81 (2000); Lujan v. Defenders of Wildlife, 504 U.S. 555, 561–62 (1992).

At least one named plaintiff must have suffered an injury in fact. See Lierboe v. State Farm Mut. Auto. Ins. Co., 350 F.3d 1018, 1022 (9th Cir. 2003) ("if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class"). The Supreme Court recently reiterated that "the threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1142-43 (2013) (internal quotations omitted) (emphasis in original).

4
Case No. 5:14-CV-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

1    A suit brought by a plaintiff without Article III standing is not a "case or controversy," and
2 an Article III federal court therefore lacks subject matter jurisdiction over the suit. Steel Co. v.
3 Citizens for a Better Env't, 523 U.S. 83, 101 (1998). "A party invoking the federal court's
4 jurisdiction has the burden of proving the actual existence of subject matter jurisdiction."
5 Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996). If a court determines that it lacks
6 subject matter jurisdiction, the court must dismiss the action. Fed. R. Civ. P. 12(h)(3).

## III.   DISCUSSION

Plaintiffs' claims against Defendants are based on two fees that they pay to live at the Vi, an entrance fee and a monthly fee. Defendants argue that Plaintiffs lack standing to assert their claims because they have not suffered an injury in fact.

### A.   Entrance Fee

The entrance fee is allegedly characterized as a "loan" to CC-PA, a portion of which is repaid to the resident or the resident's estate when the Residency Contract terminates. Compl. at ¶¶ 47-49. The contract terminates when the resident decides to leave the Vi or when the resident passes away. Id. at ¶ 49. Upon termination of the contract, the repayable portion of the entrance fee is due at the earlier of: (i) fourteen days after resale of the resident's apartment, or (ii) ten years after termination. Id. The amount of the entrance fee that is repaid depends on the date the resident entered the community, as the repayable percentage has decreased over time. Id. at ¶ 48. Plaintiffs allege that CC-PA has transferred over $190 million to CC-DG, and will be financially incapable of honoring its debts when they become due. Id. at ¶ 7. This practice allegedly impairs the value of Plaintiffs' security interest underlying the loan made to CC-PA through the entrance fee. Id. at ¶¶ 8, 60.

Defendants argue that Plaintiffs have not suffered an injury in fact because the entrance fee is a general unsecured loan for which there is no cognizable security interest, and there are no allegations that CC-PA has already failed to meet a repayment obligation. Dkt. No. 13, Mot. at 6-7. Plaintiffs contend that they have a security interest established by the Residency Contract and state law, and they suffered injury resulting from CC-PA's upstreaming of the entrance fees to

1  CC-DG that rendered CC-PA unable to cover the amounts due. Dkt. No. 29, Opp. at 5. Here, to
2  determine whether Plaintiffs have standing, a security interest must exist and Plaintiffs must have
3  sufficiently alleged injury to that security interest.

### 1. Existence of a Security Interest

Plaintiffs argue that their entrance fee constitutes a security interest. A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." Cal. Com. Code § 1201(b)(35). A "security agreement" is defined as "an agreement that creates or provides for a security interest." Id. at § 9102(a)(73). Plaintiffs attempt to establish a security interest in three ways: (1) the loan was a secured loan because the term "unsecured" was never used; (2) under California case law, lenders have a security interest in the property subject to the loan; and (3) under the California Health & Safety Code, the statutory reserve requirement is an implied term of the contract. Opp. at 5. Each will be addressed in turn.

#### i. *Type of Loan*

The Residency Contract and the promissory note state that the entrance fee is a "loan" to CC-PA, with a portion of that loan to be repaid to the resident. See Dkt. No. 1, Exh. 5, Residency Contract § 8.5; Dkt. No. 1, Exh. 6, Entrance Fee Promissory Note at 1. Neither document specifies whether the loan is "secured" or "unsecured." Plaintiffs suggest that the missing term "unsecured" indicates a secured loan, and thus creates a security interest. See Mot. at 5. This argument is unpersuasive. Plaintiffs do not argue that collateral was provided in exchange for the loan, which is indicative of a secured loan, nor do they argue that other documents taken together with the Residency Contract established a security interest. See Valley Cmty. Bank v. Progressive Cas. Ins. Co., 854 F. Supp. 2d 697, 704 (N.D. Cal. 2012) ("Several California cases suggest that multiple documents can form a security agreement[.]"). Plaintiffs' attempt at establishing a security interest solely because the term "unsecured loan" is absent from the contract fails.

#### ii. *Lenders' Security Interest Under California Case Law*

Plaintiffs argue that California case law recognizes that lenders, such as Plaintiffs, have a security interest in the property subject to the loan (here, the entrance fees). Opp. at 5. This

argument is also unpersuasive. The decisions cited by Plaintiffs are "waste" cases pertaining to "conduct on the part of the person in possession of property that substantially impairs a security interest in the property." Bedrock Fin., Inc. v. United States, 2013 WL 2244402, at *9 (E.D. Cal. May 21, 2013). Generally, waste cases deal with the "loss of value of a secured interest resulting from actual physical damage to the underlying real property." Id. at *10; see also Fait v. New Faze Dev., Inc., 207 Cal. App. 4th 284, 290 (2012) (plaintiffs alleged their security interest was impaired because the purchasers demolished the building). Moreover, Plaintiffs rely on decisions that involved secured obligations where collateral was pledged as security. See Bedrock, 2013 WL 2244402, at *8 (federal tax lien against the property); Fait, 207 Cal. App. 4th at 290 (secured by a deed of trust); The Nippon Credit Bank v. 1333 N. Cal. Boulevard, 86 Cal. App. 4th 486, 490 (2001) (secured by a deed of trust). Here, there is no indication of physical damage to the property or of a secured obligation. The decisions cited by Plaintiffs are inapposite, thus their attempt at establishing a security interest under this argument fails.

      iii.  *Security Interest Provided by Statute*

Plaintiffs argue that at the time the Residency Contract was executed, the statutory reserve requirement provided by the continuing care contract statutes under the California Health & Safety Code operated as an implied term of the contract. Opp. at 5. Plaintiffs allege that section 1792.6 required companies operating a continuing care retirement community, such as the Vi, to maintain a certain level of cash reserves for repayment of refundable contracts, and section 1793 required companies to disclose their failure to maintain that cash reserve. Compl. at ¶ 51. Defendants argue that section 1793 is obsolete because it was superseded by section 1792.6, and section 1792.6 does not apply because the Residency Contract is not a "refundable contract." Dkt. No. 31, Reply at 4.

A "refundable contract" is:

> a continuing care contract that includes a promise, expressed or implied, by the provider to pay an entrance fee refund or to repurchase the transferor's unit, membership, stock, or other interest in the continuing care retirement community when the promise to refund some or all of the initial entrance fee extends beyond

> the resident's sixth year of residency. Providers that enter into refundable contracts shall be subject to the refund reserve requirements of Section 1792.6. A continuing care contract that includes a promise to repay all or a portion of an entrance fee that is conditioned upon reoccupancy or resale of the unit previously occupied by the resident shall not be considered a refundable contract for purposes of the refund reserve requirements of Section 1792.6, provided that this conditional promise of repayment is not referred to by the applicant or provider as a "refund."

Cal. Health & Safety Code § 1771(r)(2). Section 1792.6(a) states that "[a]ny provider offering a refundable contract, or other entity assuming responsibility for refundable contracts, shall maintain a refund reserve in trust for the residents." Section 1793(a) likewise states that a "provider offering a refundable contract, or other entity assuming responsibility for refundable contracts, shall maintain a refund reserve fund in trust for the residents." Moreover, section 1793(f) states: "All continuing care retirement communities offering refundable entrance fees that are not secured by cash reserves, except those facilities that were issued a certificate of authority prior to May 31, 1995, shall clearly disclose this fact in all marketing materials and continuing care contracts."

In dispute is whether the Residency Contract is a "refundable contract." If it is, then section 1792.6 would apply and the Vi would be required to keep a refund reserve. Also in dispute is whether section 1793(f) is still good law, which would require the Vi to disclose its failure to maintain the refund reserve.

Defendants argue that the Residency Contract is not a refundable contract. Offered for the first time in its reply brief is a letter from the California Department of Social Services ("DSS")[1] to demonstrate that section 1792.6 does not apply to the Residency Contract. Reply at 4.

At this time, however, the court declines to take judicial notice of the DSS letter because it is material outside the pleadings and presents a fact in dispute. See Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (in a motion to dismiss, materials outside the pleadings cannot be considered); United States v. LSL Biotechnologies, 379 F.3d 672, 699-700 (9th Cir. 2004) (considering evidence outside the four corners of the complaint converts a motion to dismiss into a request for summary judgment). As such, the court must evaluate the complaint and accept well-

---

[1] The DSS is the agency charged with enforcing the continuing care contract statutes.

pleaded factual allegations as true. Plaintiffs assert that sections 1792.6 and 1793 were violated, but they do not allege that the Residency Contract is a refundable contract subject to sections 1792.6 and 1793. See Compl. at ¶¶ 6, 51-52, 87, 100, 146, 148, 150, 158. This is not a well-pleaded allegation. Accordingly, Plaintiffs' attempt at establishing a security interest under this argument fails.

2. Injury to Security Interest

Even assuming that Plaintiffs' entrance fee constitutes a security interest, in order to have standing, Plaintiffs' security interest must have been harmed. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted). The Ninth Circuit stated that "a concrete *risk* of harm to the plaintiffs" and "a credible *threat* of harm" can be sufficient for injury in fact. Harris v. Bd. of Supervisors, L.A. Cnty., 366 F.3d 754, 761 (9th Cir. 2004) (internal quotations and citations omitted). Here, for the purpose of this argument, the court will assume that Plaintiffs have a legally protected interest that is concrete and particularized—a security interest established by the entrance fee. The inquiry is whether there is actual or imminent injury in fact.

As to actual injury, Plaintiffs do not allege that CC-PA has already failed to meet a repayment obligation. There is no indication that any Plaintiff has terminated his/her Residency Contract and has been denied the repayable portion of the entrance fee. This was confirmed at oral argument. Thus, there is no actual injury.

Plaintiffs then argue imminent injury in fact. At oral argument, Plaintiffs relied on Harris v. Board of Supervisors to argue that there is a risk CC-PA will not be able to make the repayments when they become due. See also Opp. at 7-8. The imminent injury in Harris, however, is distinguishable from the instant matter. The plaintiffs in Harris were chronically ill individuals who faced the risk of losing medical services. Harris, 366 F.3d at 762. The Ninth Circuit found the plaintiffs to have "demonstrated that the County *already* [had] difficulty providing" access to care, and that "[g]iven the current crisis in the county health care system and

9
Case No. 5:14-CV-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

existing shortages and delays, it [was] not speculative to anticipate that reducing the resources available [would] *further* impede the County's ability to deliver medical treatment." Harris, 366 F.3d at 762 (emphasis added). By contrast, here, Plaintiffs are not already going through the process of seeking refunds only to find that their repayment requests were denied. In fact, there is no indication that any Plaintiff has yet attempted to resell their apartment or is in such critical health that termination is imminent. Accordingly, there is no indication that Defendants will *further* deprive Plaintiffs of a repayment.

Thus, Plaintiffs have not adequately shown an existing harm or an imminent harm in regards to their entrance fees such that they can establish an injury in fact.

**B.      Monthly Fees**

Plaintiffs allege that the monthly fees have been artificially inflated with regards to three items: (1) property taxes; (2) insurance fees; and (3) marketing fees. Compl. at ¶ 10. To determine whether Plaintiffs have sufficiently alleged a claim based on the monthly fees, the court must examine the Residency Contract. To interpret a contract, "[t]he court must look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." Perez-Encinas v. AmerUs Life Ins. Co., 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006). The "[l]anguage in a contract must be interpreted as a whole, and in the circumstances of the case[.]" Id. (internal quotations and citations omitted).

        1.      Property Taxes

Plaintiffs allege that because of the upstreaming of fees, CC-PA has been assessed an increased tax liability that it will pass on to Plaintiffs in the form of higher monthly fees. Compl. at ¶ 11. While Defendants have indicated that they will pay the $12 million in assessed back taxes, Plaintiffs will allegedly bear ultimate responsibility for those taxes and will pay them going forward. Id. at ¶¶ 65-66. Defendants argue that Plaintiffs do not claim they have already been harmed by the increased taxes, rather they only speculate that they may be harmed in the future. Mot. at 7. Moreover, Defendants contend that the allegations contradict the Residency Contract, which provides that real estate taxes are an operating expense of the community to be paid from

10
Case No. 5:14-CV-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

monthly fees. Id. at 7-8. In response, Plaintiffs argue that Defendants owed the community a credit for an annual operating surplus, which would have reduced their monthly fees; while Defendants agreed to pay the assessed back-taxes, they suspended the credit pending their appeal of the tax assessment. Opp. at 6. Plaintiffs have not received this credit, thus they were overcharged as a result of the taxes levied. Id.

The Residency Contract states that real estate taxes and assessments will be included in the monthly fee. Residency Contract ¶ 2.1.15. Plaintiffs admit that Defendants have agreed to pay the assessed back taxes. Opp. at 6. Moreover, the contract provides that a surplus of the community operating revenues may be applied as a credit to the residents at CC-PA's discretion. See Dkt. No. 1-3, Residency Contract, Appendix D at 2. At oral argument, Defendants argued that while at one time they distributed surplus funds to the residents, it was at Defendant's discretion to do so. In response, Plaintiffs argued that there is a written policy statement stating that an excess amount will be subject to refund, but no citation to the policy statement was provided. Also, Plaintiffs stated that after this matter was fully briefed, Defendants began issuing refunds. At the conclusion of Plaintiffs' argument, the court asked Plaintiffs' counsel to define the harm. Dkt. No. 50, Transcript at 40. Plaintiffs' counsel replied that it is an impairment of the security and that the reserve required by California law is not being followed. Id. Considering the language of the contract and counsel's statements at oral argument, there is no harm resulting from the suspension of the credit because any credits disbursed are at Defendants' discretion. Accordingly, there is no injury in fact.

2. Insurance Charges

Defendants have allegedly improperly charged earthquake insurance premiums to Plaintiffs and will, in the event of an earthquake, charge the deductibles to Plaintiffs. Compl. at ¶ 12. Under the Residency Contract, insurance charges attributable to anything other than furniture, fixtures, and equipment should allegedly be borne by CC-PA and not the residents. Id. Plaintiffs also allege that Defendants failed to disclose from the outset that Plaintiffs would be responsible for insurance charges related to the exterior of the buildings. Id. Defendants argue the Residency

11
Case No. 5:14-CV-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

1 Contract provides that the monthly fees are intended to pay for all operating costs of the
2 community, including costs of insurance policies. Mot. at 8. In response, Plaintiffs contend that
3 the Residency Contract states that residents are only responsible for replacement of capital items,
4 which do not include the buildings at the Vi. Opp. at 6.

The Residency Contract provides that residents are responsible for all costs of operating the community, and such operational costs are intended to be paid from the monthly fees. Residency Contract §§ 2.1.16, 3.3.2. Operating costs include "the costs of insurance policies, including property, casualty and liability insurance policies." Id. at § 3.3.3. Based on the plain meaning of the contract, insurance policy payments are part of operating costs that are paid from the monthly fees. Accordingly, there is no injury in fact.

3.  Marketing Fees

Plaintiffs allege that Defendants used the term "marketing costs" in a misleading manner by charging Plaintiffs for marketing activities that did not promote the Vi, but instead funded CC-DG's national marketing program. Compl. at ¶ 13. Defendants argue that Plaintiffs do not provide sufficient basis for this allegation. Mot. at 8-9.

The Residency Contract provides that an operating cost to be paid from the monthly fees includes "any marketing costs." Residency Contract at § 3.3.3. While Plaintiffs may believe that marketing costs were specific to the Vi, there are no such representations in the contract. Accordingly, there is no injury in fact.

4.  Conclusion

The Residency Contract signed by each Plaintiff clearly provides that monthly fees will be used to pay for general operating costs, insurance costs, and marketing costs. Plaintiffs have not alleged sufficient injury in fact to have standing for claims arising from their monthly fees because nothing has occurred to run afoul of the contract terms.

As the court has determined that Plaintiffs lack standing to pursue their claims, the remainder of Defendants' Motion to Dismiss will not be discussed.

12
Case No. 5:14-CV-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

IV.     **CONCLUSION**

In light of Plaintiffs' inability to show an injury in fact necessary for standing, Defendants' Motions to Dismiss Plaintiffs' Complaint are GRANTED with leave to amend. If Plaintiffs wish to further amend their Complaint, the court orders that it be filed within 15 days of the date of this order.

Because the Complaint is presently dismissed in its entirety, the court declines to set a case management schedule at this time. However, the court will address scheduling issues as raised by the parties should it become necessary.

IT IS SO ORDERED.

Dated: November 25, 2014



EDWARD J. DAVILA
United States District Judge