1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

BURTON RICHTER, et al.,

           Plaintiffs,

    v.

CC-PALO ALTO, INC., et al.,

           Defendants.

Case No.  5:14-cv-00750-EJD

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

Re: Dkt. Nos. 68, 73

       Plaintiffs Burton Richter, Linda Collins Cork, Georgia L. May, Thomas Merigan, Alfred Spivack, and Janice R. Anderson (collectively, "Plaintiffs") bring this suit individually, on behalf of a proposed class, and derivatively as creditors, against CC-Palo Alto, Inc. ("CC-PA"), CC-Development Group, Inc. ("CC-DG"), and Classic Residence Management Limited Partnership ("CRMLP") (the "Corporate Defendants"), as well as CC-PA's board of director members Penny Pritzker, Nicholas J. Pritzker, John Kevin Poorman, Gary Smith, Stephanie Fields, and Bill Sciortino (the "Director Defendants") (collectively, "Defendants").  Plaintiffs' initial Complaint was dismissed with leave to amend, and Plaintiffs timely filed a Verified First Amended Direct Class Action and Creditor Derivative Complaint ("FAC").  Dkt. No. 56.

       Presently before the Court are Defendants' Motions to Dismiss Plaintiffs' FAC.  Dkt. Nos. 68, 73 (collectively, "Mots.").   Having fully reviewed the relevant papers submitted by the parties, the court finds Defendants' arguments meritorious.  As such, Defendants' motions are GRANTED for the reasons stated below.

1

2

United States District Court
Northern District of California

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   BACKGROUND

### A.   The Parties

Plaintiffs are senior citizens who presently reside at the Vi at Palo Alto ("the Vi" or "the Community") – a continuing care retirement community ("CCRC") in Palo Alto, California.  FAC ¶ 1.  The proposed class consists of all individuals who resided at the Vi between January 1, 2005 and the present.  FAC ¶ 1.

CC-PA is the entity that owns and operates the Vi.  FAC ¶ 35.  CC-PA is a Delaware corporation with its principle place of business in Palo Alto, California.  Id.  CC-DG is CC-PA's corporate parent and is also a Delaware corporation with its principle place of business in Chicago, Illinois.  FAC ¶ 36.  CC-DG was formed by Penny Pritzker in 1987 and currently operates nine other CCRCs throughout the United States in addition to the Vi.  Id.

CRMLP is a general partner of CC-DG and provides the "day-to-day management and operation at the Vi at Palo Alto and sets its budgets with input from CC-DG."  FAC ¶ 46.  CRMLP is also based in Chicago, Illinois.  Id.

The Director Defendants are individuals who are, or previously were, members of CC-PA's Board of Directors during the time period relevant to this action.  FAC ¶¶ 37-45.  Plaintiffs contend that all named Director Defendants "participated in the management of CC-PA, and conducted and culpably participated, directly and indirectly, in the conduct of CC-PA's business affairs."  FAC ¶¶ 38-43.  By virtue of their positions as directors and/or officers, Plaintiffs contend the Director Defendants "have, and at all relevant times had, the power to control and influence and did control and influence and cause CC-PA to engage in the practices complained of herein."  FAC ¶ 44.  All Director Defendants are believed to be residents of the state of Illinois.  FAC ¶¶ 38-43.

### B.   Continuing Care Retirement Communities and the Vi at Palo Alto

CCRCs are a specialized kind of residential retirement community, offering elderly residents a flexible "continuum of care" as they age.  FAC ¶ 4.  Incoming residents typically live independently in their own apartment when they first enter the community.  However, should a

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

1  resident come to require a greater degree of care, CCRCs also provide on-site assisted living and

2  skilled nursing facilities ("SNF").  Id.  In essence, CCRCs offer elderly individuals the freedom to

3  live independently so long as they are able to do so, with the security of knowing they will be

4  cared for by professionals as they age and their health deteriorates.

5  **C.  The Residency Contract**

6  To live at the Vi, residents enter into a Continuing Care Residency Contract with CC-PA

7  ("the Residency Contract" or "the Contract").  FAC ¶ 15.  Pursuant to the terms of the Contract,

8  residents are required to pay a one-time entrance fee and recurring monthly fees.

9  **i.  The Entrance Fees**

10  The Residency Contract requires that all residents pay a one-time entrance fee to CC-PA,

11  which ranges from several hundred thousand to several million dollars.  Id.  The entrance fee is

12  characterized as a kind of "loan" to CC-PA, a portion of which is to be repaid to the resident or the

13  resident's estate when the Contract terminates.  FAC ¶¶ 15-16.  The Contract terminates when the

14  resident decides to leave the Vi or when the resident passes away.  FAC ¶ 81.  The terms of the

15  entrance fee "loan" are governed by an "Entrance Fee Note," which residents are given at the time

16  of payment.  FAC ¶¶ 15, 77.  Upon termination of the Contract, the repayable portion of the

17  entrance fee is due at the earlier of: (i) fourteen days after resale of the resident's apartment; or (ii)

18  ten years after termination.  FAC ¶ 16.  The amount of the entrance fee that is repaid depends on

19  the date the resident entered the community, as the repayable percentage has decreased over time.

20  FAC ¶¶ 16, 78.  However, about 70%-90% of the entrance fee amount is refunded to the resident

21  upon termination in accordance with the above conditions.  FAC ¶ 16.

22  Since the Vi's opening in 2005, Plaintiffs have collectively loaned Defendants over $450

23  million in entrance fees.  FAC ¶ 15.  Instead of safeguarding these fees in a reserve, Plaintiffs

24  allege that as of December 2013, CC-PA collected and transferred over $219 million acquired

25  from the entrance fees to its parent company, CC-DG, without obtaining security or any

26  repayment promise.  FAC ¶ 21.  As a result, Plaintiffs allege that CC-PA will be financially

27  incapable of honoring its debts when they become due.

28

### ii.  The Monthly Fees

The Residency Contract also requires that residents pay continuing monthly fees to CC-PA.  These fees are intended to cover the "costs of operating the Community," which is expressly addressed by the terms of the Residency Contract.  FAC ¶ 25; <u>see</u> Ex. 8, Residency Contract § 3.3.  The Contract itself details a non-exhaustive list of expenses that are considered "operating costs" of the Community, including everything from services and amenities, to taxes and employee salaries.  Ex. 8, Residency Contract § 3.3.3.

Plaintiffs allege that the monthly fees they pay have been artificially inflated due to three improper charges levied by Defendants: (1) increased property taxes; (2) earthquake insurance; and (3) improper marketing expenses.  FAC ¶ 24-29.  First, with respect to the increased property taxes, Plaintiffs contend that CC-PA has been assessed a higher tax liability as a result of the transfer of funds to CC-DG.  FAC ¶ 27.  Plaintiffs believe CC-PA will pass along the increased tax liability to Plaintiffs in the form of higher monthly fees.  <u>Id.</u>  Additionally, prior to the assessment, CC-PA returned a portion of the operating surplus to residents, but since then, no surplus has been returned.  <u>Id.</u>  Second, Defendants allegedly allocated earthquake insurance premiums to Plaintiffs, which Plaintiffs believe is improper.  FAC ¶ 28.  Third, Plaintiffs contend that the costs for CC-DG's national marketing program were inappropriately included in their monthly fees, even though the program did not promote or benefit the Vi or its residents directly.  FAC ¶ 29.

### D.  Procedural History

On February 19, 2014 Plaintiffs filed the initial complaint in this action against CC-PA, CC-DG, and CRMLP, alleging claims of (1) Concealment; (2) Negligent Misrepresentation; (3) Breach of Fiduciary Duty and Constructive Trust; (4) Financial Abuse of Elders in violation of California Welfare And Institutions Code §§ 15600, *et seq*.; (5) Violation of the California Consumer Legal Remedies Act, California Civil Code §§ 1750, *et seq*.; (6) Violation of California Business and Professions Code §§ 17200, *et seq*.; and (7) Breach of Contract.  Dkt. No. 1.  In March 2014, Defendants moved to dismiss and the Court granted Defendants' motion with leave

United States District Court
Northern District of California

1    to amend.  Dkt. Nos. 13, 55.

2         On December 10, 2014, Plaintiffs filed the FAC, reasserting causes of action for (1)

3    Financial Abuse of Elders in violation of California Welfare and Institutions Code §§ 15600, *et*

4    *seq*.; (2) Concealment; (3) Negligent Misrepresentation; (4) Breach of Fiduciary Duty and

5    Constructive Trust; (5) Violation of the California Consumer Legal Remedies Act ("CLRA"),

6    California Civil Code §§ 1750, *et seq*.; (6) violation of the Unfair Competition Law ("UCL"),

7    California Business and Professions Code §§ 17200, *et seq*. (Restitution and Discouragement); (7)

8    violation of the UCL (Injunctive Relief); and (8) Breach of Contract.  Plaintiffs also alleged new

9    causes of action for (9) Breach of the Implied Covenant of Good Faith and Fair Dealing; (10)

10   Declaratory Relief; (11) Creditor Claim for Breach of Fiduciary Duties Against the Director

11   Defendants; (12) Creditor Claim for Breach of Fiduciary Duties or in the alternative Aiding and

12   Abetting the Director Defendants' Breach of Fiduciary Duties; (13) Payment of Unlawful

13   Dividends; (14) Fraudulent Transfer of Assets; and (15) Corporate Waste.  Dkt. No. 56.

14        On February 20, 2015 Defendants' filed two Motions to Dismiss Plaintiffs' FAC.  Dkt.

15   Nos. 68, 73.  Corporate Defendants filed a motion to dismiss, reasserting the argument that

16   Plaintiffs lack standing and have failed to state a claim.  See Corp. Defs.' Mot. to Dismiss ("Corp.

17   MTD"), Dkt. No 68.  Director Defendants joined Corporate Defendants' Motion, and also

18   separately moved to dismiss on grounds specifically related to the Director Defendants and

19   Plaintiffs derivative claims.  See Director Defs.' Mot. to Dismiss ("Director MTD"), Dkt. No 73.

20   Plaintiffs filed an Opposition to Defendants motions to dismiss on March 20, 2015.  Pl. Opp. to

21   Corp. Defs.' MTD ("Opp."), Dkt. No. 74-1; Pl. Opp. to Director Defs.' MTD ("Opp. to Director

22   MTD"), Dkt. No. 74.  And both Corporate and Director Defendants filed reply briefs in support of

23   their motions on April 20, 2015.  See Corp. Defs'. Reply ("Reply"), Dkt. No 77; Director Defs.'

24   Reply ("Director Reply"), Dkt. No. 78.

25   **II.    LEGAL STANDARD**

26      **A.    Federal Rule of Civil Procedure 12(b)(1)**

27        A Rule 12(b)(1) motion challenges subject matter jurisdiction and may be either facial or

28

1  factual.  Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir.2004).  A facial 12(b)(1) motion involves

2  an inquiry confined to the allegations in the complaint, whereas a factual 12(b)(1) motion permits

3  the court to look beyond the complaint to extrinsic evidence.  Id.  When, as here, a defendant

4  makes a facial challenge, all material allegations in the complaint are assumed true, and the court

5  must determine whether lack of federal jurisdiction appears from the face of the complaint itself.

6  Thornhill Publ'g Co. v. General Tel. Elec., 594 F.2d 730, 733 (9th Cir.1979).

7      Standing is properly challenged through a Rule 12(b)(1) motion.  White v. Lee, 227 F.3d

8  1214, 1242 (9th Cir. 2000).  "A plaintiff has the burden to establish that it has standing."

9  WildEarth Guardians v. United States Dep't of Agric., 795 F.3d 1148, 1154 (9th Cir. 2015).

10     **B.    Federal Rule of Civil Procedure 12(b)(6)**

11      Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient

12  specificity to "give the defendant fair notice of what the … claim is and the grounds upon which it

13  rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted).

14  Although particular detail is not generally necessary, the factual allegations "must be enough to

15  raise a right to relief above the speculative level" such that the claim "is plausible on its face."  Id.

16  at 556-57.  A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to

17  state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Dismissal of a claim

18  under Rule 12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of

19  sufficient facts alleged under a cognizable legal theory."  Balistreri v. Pacifica Police Dep't, 901

20  F.2d 696, 699 (9th Cir. 1988); see Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104

21  (9th Cir. 2008).

22      At the motion to dismiss stage, the court must read and construe the complaint in the light

23  most favorable to the non-moving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th

24  Cir. 1996).  Additionally, the court must accept as true all "well-pleaded factual allegations."

25  Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009).  However, "courts are not bound to accept as true a

26  legal conclusion couched as a factual allegation."  Twombly, 550 U.S. at 555.  Nor is a complaint

27  sufficient if it merely "tenders naked assertions devoid of further factual enhancement."  Iqbal,

28

United States District Court
Northern District of California

556 U.S. at 678 (internal quotation marks omitted).  "In all cases, evaluating a complaint's plausibility is a context-specific endeavor that requires courts to draw on ... judicial experience and common sense."  Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Claims that sound in fraud are subject to a heightened pleading standard.  Fed. R. Civ. Proc. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1103-1104 (9th Cir. 2003) (recognizing that claims "grounded in fraud" or which "sound in fraud" must meet the Rule 9(b) pleading standard, even if fraud is not an element of the claim).  The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985).  This requires "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  Swartz, 476 F.3d at 764.  In other words, fraud or claims asserting fraudulent conduct must generally contain more specific facts than is necessary to support other causes of action.

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings."  Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990).  However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice.  See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).  The Ninth Circuit has recognized that the district court "need not … accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."  Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); see Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003) (holding the court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.").  "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

United States District Court
Northern District of California

1    inferences." <u>Sprewell</u>, 266 F.3d at 979.

2           In the event that a motion to dismiss is granted, "leave to amend should be granted 'unless

3    the court determines that the allegation of other facts consistent with the challenged pleading could

4    not possibly cure the deficiency.'" <u>DeSoto v. Yellow Freight Sys., Inc</u>., 957 F.2d 655, 658 (9th

5    Cir. 1992) (quoting <u>Schreiber Distrib. Co. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th

6    Cir. 1986)).

### III.    DISCUSSION

8           Plaintiffs' allege that they suffered harm as a result of Defendants' improper management

9    and assessment of the two fees residents are required to pay in order to live at the Vi: (1) the initial

10    entrance fee and (2) the continuing monthly fees.  Defendants move to dismiss all of Plaintiffs'

11    claims on Article III standing grounds, arguing Plaintiffs have not suffered an injury in fact and do

12    not face the threat of a concrete injury in the immediate future.  Corp. MTD at 1.[1]  Defendants

13    also move to dismiss each of Plaintiffs' substantive claims for failure to state a claim upon which

14    relief can be granted.  <u>Id.</u>

15           Because Article III standing is a threshold jurisdictional question, the Court will address

16    Defendants' 12(b)(1) motion prior to the analysis of any individual claims.  <u>See</u> <u>Steel Co. v.</u>

17    <u>Citizens for a Better Env.</u>, 523 U.S. 83, 94 (1998).

#### A.    Article III Standing

19           Federal courts are courts of limited jurisdiction, adjudicating only matters that present an

20    actual "case or controversy" under Article III of the U.S. Constitution.  <u>See</u> <u>City of Los Angeles v.</u>

21    <u>Lyons</u>, 461 U.S. 95, 101 (1983); <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377

22    (1994.  To satisfy the Article III standing, a plaintiff must establish: (1) an "injury in fact" that is

23    both concrete and particularized, as well as actual and imminent; (2) that the injury is fairly

24    traceable to the challenged action of the defendant; and (3) that it is likely, rather than merely

---

[1] Unless otherwise specified, reference to Defendants' positions should be read as the general position of both Corporate and Director Defendants.  To the extent that Director Defendants have a unique defense or argument, this will be noted where relevant.

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

United States District Court
Northern District of California

1  speculative, that the injury will be redressed by a favorable decision. <u>Friends of the Earth, Inc. v.</u>

2  <u>Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 180-81 (2000); <u>Lujan v. Defenders of Wildlife</u>, 504

3  U.S. 555, 561-62 (1992).

4       To satisfy the "injury in fact" element, "the plaintiff must show that he personally has

5  suffered some actual or threatened injury as a result of the putatively illegal conduct of the

6  defendant." <u>Gladstone Realtors v. Village of Bellwood</u>, 441 U.S. 91, 100 (1979). In a class

7  action, at least one named plaintiff must have suffered an injury in fact. <u>See</u> <u>Lierboe v. State Farm</u>

8  <u>Mut. Auto. Ins. Co.</u>, 350 F.3d 1018, 1022 (9th Cir. 2003) ("if none of the named plaintiffs

9  purporting to represent a class establishes the requisite of a case or controversy with the

10 defendants, none may seek relief on behalf of himself or any other member of the class"). The

11 Supreme Court has further emphasized that "the threatened injury must be *certainly impending* to

12 constitute injury in fact, and that allegations of *possible* future injury are not sufficient." <u>Clapper</u>

13 <u>v. Amnesty Int'l USA</u>, 133 S. Ct. 1138, 1142-43 (2013) (internal quotations omitted) (emphasis in

14 original).

15      Here, while Plaintiffs' make numerous allegations in connection with their fifteen causes

16 of action, the primary injuries alleged concern Vi's one-time entrance fee and its recurring

17 monthly fees. With respect to the entrance fees, Plaintiffs allege that CC-PA failed to establish

18 and otherwise maintain a "refund reserve" of these fees, as required by California statute, and

19 instead illegally distributed – or "upstreamed" – hundreds of millions of dollars of its liquid

20 reserves to CC-DG. FAC ¶¶ 2, 15. With respect to the monthly fees, Plaintiffs contend that

21 Defendants allocated improper expenses to residents of Vi in the form of artificially inflated

22 monthly fees. FAC ¶ 24. The Court will address each of these alleged injuries, beginning with the

23 monthly fees.

24        **i.**    **Plaintiffs Do Not Have Standing as to the Recurring Monthly Fees**

25      Plaintiffs allege they have suffered an injury in fact because they paid and continue to pay

26 sizable monthly fees that "have been artificially inflated due to improper charges levied by

27 Defendants" and CC-PA's failure to maintain the necessary reserves. FAC ¶ 24. Plaintiffs

28

United States District Court
Northern District of California

1    identify three kinds of charges they contend are improper: (1) increased property taxes; (2)

2    earthquake insurance premiums; and (3) marketing charges that did not solely benefit Vi's current

3    residents.

4                    a.    Increased Property Taxes

5            Plaintiffs make two related arguments regarding their alleged injuries with respect to

6    property taxes.  First, Plaintiffs allege that as a result of the "illegal upstreaming" of the entity's

7    cash reserves, "CC-PA has been assessed millions of dollars of increased property taxes," which it

8    "indicated" it will allocate to Plaintiffs and the Class in the form of higher monthly fees.  FAC

9    ¶ 27.  CC-PA is presently in the process of challenging the tax assessment with the Assessment

10   Appeals Board.  Corp. MTD at 12.  If unsuccessful, Defendants would be liable for approximately

11   $12 million in "back taxes" and an additional tax assessment of $1.9 million annually.  FAC ¶

12   119.  Defendants have stated that they will pay the back taxes if the appeal is unsuccessful, but

13   Plaintiffs contend that residents will nevertheless bear the ultimate responsibility for the taxes.  Id.

14           This argument fails in two respects.   First, no increased property tax has been allocated to

15   Plaintiffs as of yet.  The fact that CC-PA indicated it may allocate them in the future is speculative

16   at best.  Moreover, Defendants have agreed to pay the amount due in back taxes if the appeal

17   proves unsuccessful.  FAC ¶ 119; Corp. MTD at 12.

18           And second, even if Defendants had allocated some of CC-PA's increased tax burden to

19   residents by increasing monthly fees, this may well be permissible under the terms of the

20   Residency Contract.  According to the Contract's language, "real estate taxes, special taxes or

21   assessments, and any other taxes [CC-PA] believes may be levied by the City of Palo Alto,

22   County of Santa Clara, or State of California … will be included in the determination of

23   [residents'] Monthly Fee."  Ex. 8, Residency Contract § 2.1.15.  While this does not give

24   Defendants license to unreasonably offload self-inflicted tax obligations or penalties on residents,

25   the Contract clearly provides for considering and including tax liabilities and assessments when

26   determining monthly fees.

27           Plaintiffs further allege that as a result of the increased tax liability, CC-PA refused to

28

credit or return surplus funds to residents, functionally increasing their monthly fees.  FAC ¶ 27.

Previously, monthly fees collected in excess of the operating costs of the Community would be

held as part of the "Cumulative Operating Surplus" ("COS") and then credited back to residents.

Id.  However, after the tax assessment, CC-PA suspended crediting the surplus funds to residents

and instead retained the money in a reserve account.   FAC ¶ 27; Corp. MTD at 13.  Plaintiffs

contend this violated CC-PA's own policy regarding the COS and resulted in residents being

overcharged.  FAC ¶¶ 27, 120.  Defendants counter that under the express terms of the Residency

Contract, CC-PA maintains "complete discretion to retain operating surpluses as a reserve or to

not credit a portion of the surplus back to residents to lower future monthly fees."  Corp. MTD at

13.

    The terms of the Residency Contract provide that a surplus of the community operating

revenues may be retained or credited to the residents at CC-PA's discretion.  See FAC Ex. 8,

Residency Contract, Appendix D at 2.[2]  Plaintiffs contend that although Defendants' "Policy on

Surpluses and Deficits" afforded CC-PA unilateral discretion to retain the monthly fees, a later-

incorporated policy entitled "Proposed Guidelines Regarding Cumulative Operating Surplus,"

modified the policy to require the return of surplus funds to residents.  FAC ¶ 120; see Ex. 7,

("Proposed Guidelines"), Dkt. No. 56-6.  Defendants respond that the Proposed Guidelines were

never made part of the Residency Contract, but maintain that CC-PA retains discretion to withhold

credits under either the Contract or the Proposed Guidelines.  Corp. MTD at 13, n. 11.  The Court

agrees with Defendants.

    Plaintiffs make no credible allegation that the Proposed Guidelines were meant to supplant

the terms of the Residency Contract.   But even if the Court accepted Plaintiffs' contention that the

Proposed Guidelines control here, the Guidelines' language still affords discretion to withhold

_____

[2] Appendix D to the Residency Contract – entitled Monthly Fee Calculation, Community
Operating Costs" – provides: "If an operating surplus is generated" after certain conditions are
met, "such surplus will be retained by the Community and may be used *at the discretion of the
Provider* as a reserve to cover operating deficits or to lower future monthly fees." (emphasis
added.)

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

1    surplus funds when CC-PA deems necessary.  See FAC, Ex. 7.  The Proposed Guidelines state

2    that the COS funds shall be credited to current residents "unless then available information

3    indicates that greater retention may be necessary because of significant unanticipated expenses or

4    loss of revenue for the current year."  Id.  The fact that CC-PA may owe $12 million in back taxes

5    and/or face additional tax assessments of $1.9 million annually would qualify as significant

6    unanticipated expenses.

7            Finally, even if the Court found that the policy clearly mandated that the operating surplus

8    be credited to residents, Plaintiffs still fail to allege an injury because they admit that Defendants

9    reinstated the practice as of December 8, 2014.  FAC ¶ 27; see Corp. MTD at 13.  Accordingly,

10   Plaintiffs have not suffered an injury in fact.

                                b.    Earthquake Insurance Premiums

12           Next, Plaintiffs contend that CC-PA misallocated earthquake insurance premiums to

13   residents, leading to higher monthly fees.  Plaintiffs believe that it is "wrong for CC-PA to allocate

14   to the residents [the] costs of insuring its buildings and improvements, in which the residents have

15   no ownership, leasehold or other interest."  FAC ¶ 28.  Plaintiffs admit that under section 3.3.3 the

16   Residency Contract, monthly fees are intended to cover the operating costs of the Community,

17   including "the costs of insurance policies."  FAC ¶ 125; see Ex. 8.  However, they argue that

18   subsection (iv) limits these costs to "maintenance, repairs, and replacements of capital items,

19   including the furniture, fixtures, and equipment."  FAC ¶ 125; see Ex. 8, § 3.3.3(iv).  Plaintiffs

20   also contend that CC-PA's "Policy for Capital Expenditure Responsibility" further supports this

21   position by "confirm[ing] that CC-PA is to retain financial responsibility for damages or

22   destruction to the buildings and improvements of the community."  FAC ¶ 125.

23           Plaintiffs' argument is unpersuasive based on a plain reading of the language in the

24   Residency Contract.  The enumerated subsections that Plaintiffs contend define, and thus limit,

25   what qualifies as "operating costs" are non-exhaustive.  Section 3.3.3 explicitly states that the

26   monthly fees are intended to "include, but are not limited to," the costs identified in the succeeding

27   subsections.  Ex. 8, § 3.3.3.  Additionally, the clause that specifically refers to insurance policies

28

United States District Court
Northern District of California

12

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

1   provides that the "operating costs" include "property, casualty and liability insurance policies."

2   Id. at § 3.3.3(ii).  Earthquake insurance is property insurance.  Give this language, its inclusion in

3   the residents' monthly fees is contemplated by the terms of the Residency Contract.[3]

4         Aside from the Residency Contract, the Policy for Capital Expenditure Responsibility

5   lends no additional support to Plaintiffs here.  While this policy contains a list delineating certain

6   costs as CC-PA's exclusive responsibility, the policy specifically states that the "list is intended to

7   be illustrative and not exhaustive in providing guidance to determine whether costs of a capital

8   nature are the responsibility of the Provider or the residents."  See FAC Ex. 32 at 1-2.  Moreover,

9   the policy's reference to "damage or destruction" is specific, not general.  That is, the policy refers

10   to damage caused by "termites, dry rot or fungus" as the responsibility of CC-PA, but does not

11   make any such provision regarding damage to the Community's buildings or infrastructure

12   generally.  Id. at 2.

13        Based on the plain meaning of the Residency Contract, insurance premiums – specifically,

14   premiums for property insurance – are considered part of the Community's operating costs.

15   Pursuant to the terms of the Contract, these operating costs are included in residents' monthly fees.

16   Plaintiffs have therefore suffered no harm in paying monthly fees that include premiums for

17   earthquake insurance.  Accordingly, there is no injury in fact.

18         c.   Marketing Costs

19         Finally, Plaintiffs' allege that they were injured when Defendants improperly characterized

20   certain "marketing costs" as operating costs of the Community, inflating their monthly fees.

21   Plaintiffs' acknowledge that the Residency Contract expressly includes "marketing costs" as an

22

23   [3] It is worth noting that earthquake insurance is a special kind of property insurance that many

24   homeowners in California elect not to have.  As one article explains, "[e]arthquake insurance
extraordinarily expensive – it typically doubles a homeowner's annual premiums – and most

25   policies come with a 10 or 15 percent deductible, meaning that damage would have to be pretty
severe before policyholders would be able to tap into their coverage."  Kottle, Marni Leff

26   "Earthquake insurance in the Bay Area is expensive, risky business," Special to The Chronicle
(October 20, 2007) available at http://www.sfgate.com/realestate/article/Earthquake-insurance-in-

27   the-Bay-Area-is-2517666.php.  However, despite the arguably unique nature of earthquake
insurance and its unusually high cost, the language of the Contract itself is unambiguous in

28   affording CC-PA broad latitude to allocate such costs to residents by way of monthly fees.

1    operating cost of the Community to be paid by the monthly fees.  FAC ¶ 128; see Ex. 8,

2    § 3.3.3(viii).  However, Plaintiffs argue that the term "marketing costs" is not defined, and in fact

3    a significant portion of marketing expenses paid for with the monthly fees should not be

4    considered operating costs of the Community because they were designed to benefit CC-DG.

5    FAC ¶ 29.  Plaintiffs allege that they paid "in excess of $5.5 million of marketing costs from

6    March 2006 through 2013," some of which was allocated "to CC-DG's national marketing

7    campaign."  FAC ¶ 129.  They believe that their fees should only pay for "marketing costs that are

8    necessary to operate the Community," not corporate expenses for CC-DG "incurred solely to line

9    Defendants' pockets with Entrance Fees that do not benefit the Community."  FAC ¶ 29.

10       Defendants again contend that Plaintiffs position directly contradicts the terms of the

11   Residency Contract, which provides that marking expenses are an operating cost of the

12   Community.  Corp. MTD at 14.  Defendants argue that all marketing costs – including national

13   marketing costs – relate to the operations of the Community and benefit Plaintiffs by maintaining

14   ongoing sales and waiting list of prospective residents.  Id.  Plaintiffs respond that *both* CC-PA

15   and Plaintiffs benefit from the resale of an apartment, and therefore "CC-PA has the obligation to

16   equitably allocate marketing costs to Plaintiffs consistent with the benefit Plaintiffs derive

17   therefrom." [4]  Opp. at 19.

18       Looking again to the plain language of the Residency Contract, Plaintiffs fail to allege any

19   valid harm.  The Contract provides that "*any* marketing costs incurred" after certain occupancy

20   conditions are met is an operating cost to be paid from the monthly fees.  FAC at Ex. 8,

21   § 3.3.3(viii) (emphasis added).  As stated in the Court's previous ruling, although Plaintiffs may

22   believe that these marketing costs were or should be specific to the Vi, "there are no such

23   representations in the contract."  Order Granting Defs.' Mot. to Dismiss ("Prior Order") at 12,

24   Dkt. No. 55; see FAC at Ex. 8, § 3.3.3.  Similarly, Plaintiffs' suggestion that marketing costs

---

[4] Plaintiffs allege they "have paid 100% of CC-PA's marketing costs" to date, amounting to over $5 million.  Opp. at 19.  And although CC-PA "has generated over $500 million in Entrance Fee loans from its marketing efforts, CC-PA has allocated no marketing costs to itself."  Id.

United States District Court
Northern District of California

should be reapportioned between the parties based on respective benefit finds no support in the language of the contracts to which they agreed, and the Court cannot read new limitations into otherwise straightforward contractual terms.  Consequently, Plaintiffs fail to plead any injury in fact with respect to marketing costs.

In sum, the Residency Contract signed by each Plaintiff clearly states that monthly fees will be used to pay for general operating costs – including taxes, insurance premiums, and marketing costs.  Because these costs were expressly provided for by the plain language of the Contract, Plaintiffs have not alleged an injury arising from their monthly fees.  Accordingly, to the extent that Plaintiffs' claims are based on a purported injury related to these fees, Plaintiffs lack standing under Article III.

### ii.    Plaintiffs Do Not Have Standing as to the Entrance Fees

Plaintiffs also contend they have suffered an injury as a result of CC-PA's failure to maintain a "refund reserve" of the entrance fees, as required by California law.  They argue that "CC-PA's failure to maintain sufficient cash reserves to refund the Entrance Fees, and non-disclosure of this fact, is a direct and ongoing violation of [California] Health & Safety Code §§ 1972.6 and 1973, an impairment of Plaintiffs' security interest, and a breach of the implied reserve requirement term of the Refundable Residence Contracts and Promissory Notes."  FAC ¶ 87.

Defendants respond that Plaintiffs have not suffered any injury in fact with respect to the entrance fees and therefore do not have standing to bring this action.  First, Defendants maintain that the entrance fee is a "general unsecured obligation" in which Plaintiff has no cognizable security interest.  Second, Defendants argue that even if residents do have a security interest in the entrance fees, there are no allegations that any resident was denied – or is presently awaiting – a refund.  Corp. MTD at 6-11.  And because CC-PA has always satisfied its repayment obligations pursuant to the Residency Contracts, Plaintiffs have not suffered an injury.

In an effort to establish an injury in fact and thus establish standing, Plaintiffs argue that they have a "vested security interest in the entrance fees created by statute."  Opp. at 6.  Although Article III's injury requirement cannot be displaced by statute, when a statute creates a legal right,

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

United States District Court
Northern District of California

the invasion of that legal right can create standing.  Edwards v. First Am. Corp., 610 F.3d 514, 517

(9th Cir. 2010); see Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997) ("Congress cannot erase Article

III's standing requirements by statutorily granting the right to sue to a plaintiff who would not

otherwise have standing.").  The relevant question in such circumstances is "whether the

constitutional or statutory provision on which the claim rests properly can be understood as

granting persons in the plaintiff's position a right to judicial relief."  Id.  This so-called "statutory

standing" can be established by pleading a violation of a right conferred by statute so long as the

plaintiff alleges "a distinct and palpable injury to himself, even if it is an injury shared by a large

class of other possible litigants."  Warth v. Seldin, 422 U.S. 490, 501 (1975).  Whether or not a

plaintiff has stated a basis for statutory standing is tested under Rule 12(b)(6) rather than Rule

12(b)(1).  Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011).

Here, Plaintiffs allege that the Residency Contract at issue is a "refundable contract" under

California Health & Safety Code Section 1771(r)(2).  FAC ¶ 18; Opp. at 7.  And as a refundable

contract, sections 1792.6 and 1793 require companies operating continuing care communities –

such as the Vi – to maintain a cash reserve for the repayment of these contracts.  FAC ¶¶ 18-19.

Plaintiffs argue that "[t]his reserve requirement constitutes a security interest" for residents, that

Defendants breached their obligations by failing to maintain such a reserve, and that Plaintiffs

were injured as a result.  FAC. ¶¶ 18-19.  The elements of this argument will be addressed in turn.

### a.   The Residency Contract

The first issue is whether the Vi's Residency Contract is a "refundable contract."  If it is,

then Section 1792.6 would apply and CC-PA would be required to maintain a refund reserve in

accordance with its statutory provisions.  A refundable contract is defined as:

> [A] continuing care contract that includes a promise, expressed or implied, by the
> provider to pay an entrance fee refund or to repurchase the transferor's unit,
> membership, stock, or other interest in the continuing care retirement community
> when the promise to refund some or all of the initial entrance fee extends beyond
> the resident's sixth year of residency.  Providers that enter into refundable contracts
> shall be subject to the refund reserve requirements of Section 1792.6.  A continuing
> care contract that includes a promise to repay all or a portion of an entrance fee that
> is conditioned upon reoccupancy or resale of the unit previously occupied by the
> resident shall not be considered a refundable contract for purposes of the refund

16

United States District Court
Northern District of California

reserve requirements of Section 1792.6, provided that this conditional promise of repayment is not referred to by the applicant or provider as a "refund."

Cal. Health & Safety Code § 1771(r)(2).

Section 1792.6(a) of the California Health & Safety Code directs that "[a]ny provider offering a refundable contract, or other entity assuming responsibility for refundable contracts, shall maintain a refund reserve in trust for the residents." Section 1793(a) similarly states that a "provider offering a refundable contract, or other entity assuming responsibility for refundable contracts, shall maintain a refund reserve fund in trust for the residents." Section 1793(f) further requires that "[a]ll continuing care retirement communities offering refundable entrance fees that are not secured by cash reserves … clearly disclose this fact in all marketing materials and continuing care contracts."

Defendants argue that the Residency Contract is not a "refundable contract" under Section 1771, and therefore is not subject to the refund reserve requirements of Section 1792.6. Defendants attempt to distinguish the Vi's Residency Contract by arguing that "CC-PA's repayment obligations are primarily conditioned on resale of the unit," making the contracts "contingent on resale" contracts, as opposed to refundable contracts. Corp. MTD at 8; see § 1771(r)(2).

The Court disagrees. According to the plain language of Residency Contract, a refund is due to the resident either fourteen days after the unit is resold, *or* ten years after the termination of the Contract, whichever occurs first. [5] See Ex. 8, § 8.5.2; Ex. 16, § 9.1.2. Defendants' belief that

---

[5] Specifically, the contractual language reads, in relevant part:

> Repayments shall be paid to You [the resident] on the earlier of (i) fourteen (14) calendar days after the Provider enters into a residency contract covering Your former Home with a new resident who has executed a continuing care residency contract and paid the applicable Entrance Fee for Your former Home; or (ii) ten (10) years after the date You 'make Your Home available' to the Provider." Ex. 16, § 9.1.2.

On previous versions of the Residency Contract, the non-occupancy provision was for twenty five years, instead of ten. See Ex. 8 § 8.5.2.

17

United States District Court
Northern District of California

"the inclusion of the ten year outside repayment date does not change the conditional nature of the repayment obligation" is simply incorrect.  See Mot at 8.  The disjunctive "or" guarantees that residents are entitled to the refundable portion of their entrance fee regardless of whether their unit is resold – the fact that the refund may not come due for ten years if the unit is not resold is ultimately irrelevant.  The Court therefore concludes the Residency Contract is subject to the refund reserve requirements of Section 1792.6.[6]

      b.  Injury In Fact

       The standing inquiry does not end with the determination that the Residency Contract is a refundable contract.  Rather, the Court must still resolve whether Defendants' failure to comply with the California Health & Safety Codes governing refundable contracts injured Plaintiffs' legally protected right.

      In order for Plaintiffs to have standing with respect to the entrance fees, a security interest must exist and Plaintiffs must have sufficiently alleged injury to that security interest.  A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation."  Cal. Com. Code § 1201(b)(35).  For the purpose of demonstrating Article III standing, the Ninth Circuit has instructed that "a concrete *risk* of harm to the plaintiffs" and "a credible *threat* of harm" can be sufficient for injury in fact.  Harris v. Bd. of Supervisors, L.A. Cnty., 366 F.3d 754, 761 (9th Cir. 2004) (internal quotations and citations omitted).

      Here, it is not clear that Plaintiffs have established that they hold a security interest in the

---

[6] Alternatively, Defendants seek to distinguish between refundable contracts and "fixed-time contingent on resale contracts," arguing that at most, the Residency Contract is the latter. However, this distinction is immaterial for the purposes of determining whether the refund reserve requirement applies because Defendants admit that as of May 1, 2012, the refund reserve requirement applies to fixed-time contingent on resale contracts as well as refundable contracts. Mot at 9.  Where this distinction may be relevant is in determining the amount of money Defendants need to maintain in the refund reserve to be in compliance with the statute.  That is, Defendants argue that because this requirement only went into effect in of May 2012 and is not retroactive, CC-PA is only required to keep a refund reserve for the contracts entered into after May 1, 2012. Id.  And to that extent, CC-PA has fully funded a *limited* entrance fee reserve. However, as discussed at greater length in the following subsection, the Court believes that the DSS is the entity best suited to determine whether CC-PA is in compliance with the California Health & Safety Code.

United States District Court
Northern District of California

entrance fees or the refund reserve intended to secure such fees.  However, it is unnecessary for the Court to make such a finding in this case, because even if Plaintiffs do have a security interest, they have suffered no injury to that interest.  That is, even assuming that Plaintiffs' entrance fees constitute a security interest, in order to have standing, Plaintiffs' interest must have been harmed.  Plaintiffs again fail to allege any such harm.

The basic premise of Plaintiffs' argument regarding their entrance fees is that because Section 1792.6 requires CCRCs like the Vi to maintain a cash reserve account, in failing to do so Defendants breached their obligations under the California Health & Safety Code.  See FAC ¶¶ 18-19; Opp. at 6-7.  This premise may well be correct.  Indeed, Plaintiffs have alleged facts that, if true, could show that Defendants are not in compliance with California statutes regulating CCRCs.  However, non-compliance with a statutory scheme is not an independent injury that itself confers standing.  As discussed above, to have statutory standing the statute must create a legally protected interest and Plaintiffs must allege "a distinct and palpable injury" to that interest.  See Warth, 522 U.S. at 501; Lujan, 504 U.S. at 560.  Plaintiffs have not alleged any distinct injury as a result of Defendants' purported non-compliance with sections 1792.6, and 1793 of the California Health & Safety Code.

In opposition to this Motion, Plaintiffs challenge Defendants' claim that no plaintiff has terminated a contract or is awaiting repayment.  Opp. at 17.  Plaintiffs respond that they "have alleged that several residents of the Care Center have, in fact, terminated their contracts (either by death or departure from the facility), and that C-PA has been unable to pay its obligations on their Entrance Fees without financing from CC-DG."  Id.  In support of this, Plaintiffs cite to the FAC, paragraphs 52, 74, 97, 102, 105, and 116.  However, the identified paragraphs are devoid of any factual allegations that a resident terminated his or her Residency Contract and was denied or is presently awaiting a repayment due to them thereunder. [7]

---

[7] Paragraph 54 alleges that approximately 500 residents at the Vi "loaned CC-PA substantial Entrance Fees that have not been repaid."  However, per the terms of the Residency Contract, no resident would be entitled to the repayable portion of their entrance fee until *after* they terminate the Contract.  Because this allegation contains no claim that a contract has been terminated in

United States District Court
Northern District of California

United States District Court
Northern District of California

At most, these paragraphs establish that CC-PA was at times unable to afford the repayment from its individual funds.  But in such instances, Plaintiffs concede that CC-DG voluntarily provided sufficient funds to cover these obligations.  See FAC ¶¶ 102, 105.  Consequently, even if it is true that CC-DG financed certain repayments in place of CC-PA, Plaintiffs fail to demonstrate how the source of the financing harmed them.  In reviewing the identified paragraphs carefully – as well as the rest of the FAC – the Court finds no indication that any plaintiff terminated his or her Contract and was denied the repayable portion of the entrance fee to which they were entitled.  Plaintiffs' belief that such circumstances suggest CC-PA will become unable to pay its debts in the future is insufficient.  Their allegations, however, establish that Defendants have thus far made repayments when they come due, and a non-repayment is not imminent.  Consequently, Plaintiffs have not alleged an actual injury sufficient to give them standing.

       c.   The California State Department of Social Services

The language of pertinent California Health & Safety Code provisions further makes clear that these sections were not intended to create a private right of action for residents in the event of a CCRC's non-compliance.  As a general matter, the California Health & Safety Code regulates the operation of CCRCs in California.  The Code further provides that these communities should

---

conjunction with a failure to repay, no injury has occurred.

Paragraph 74 specifies the facilities located at the Vi.

Paragraph 97 (and 98) allege that based on the Stanford Ground Lease (the property on which Vi sits), the ability to require new entrance fees will gradually reduce over time, therefore limiting the ability to raise the necessary funds to issue repayments to earlier residents.  Again, however, this involves a potential for future harm and is neither imminent nor certain.

Paragraph 102 contends that from 2005-1013, CC-PA "has had insufficient funds" to repay residents, and "its obligations to such residents have matured upon death or departure."  However, this same paragraph admits that CC-DG advanced the funds necessary to cover these obligations.

Paragraph 105 alleges that "CC-PA's distribution of its liquid assets to CC-DG … (d) have caused CC-PA to be unable to pay its obligations to Care Center residents as they matured without financial assistance from CC-DG."  However, this allegation is not only conclusory, but implies that with the assistance from CC-DG, residents could indeed receive the refunds owed to them.

Paragraph 116 addresses the Vi's physical property and the allegedly increased tax liability assessed to CC-PA.

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

be "monitored and regulated by the State Department of Social Services" (the "Department" or "DSS"). § 1770(d). In the event that a community violates the regulations, the "department, in its discretion, may condition, suspend, or revoke" the CCRC's certificate of authority or licensing certificate, or subject the community to fines. § 1793.21. In relevant part, this enforcement authority is expressly applicable where a provider has, *inter alia*: "Failed to maintain at least the minimum statutory reserves required by Section 1792.2;" "Failed to comply with the refund reserve requirements stated in Section 1793;" "Materially changed or deviated from an approved plan of operation without the prior consent of the department;" "Failed to fulfill his or her obligations under continuing care contracts;" or "Made material misrepresentations to depositors, prospective residents, or residents of a continuing care retirement community." § 1793.21(k)(m)(r)-(t). The legislature recognized the need for regulatory oversight of CCRCs and designed such oversight authority to the DSS.

The legislature further authorized explicit mechanisms of enforcement in the event of non-compliance, specifying:

> In the case of any violation or threatened violation of this chapter, the department may institute a proceeding or may request the Attorney General to institute a proceeding to obtain injunctive or other equitable relief in the superior court in and for the county in which the violation has occurred or will occur, or in which the principal place of business of the provider is located.

Cal. Health & Safety Code § 1793.29.

Here, the statutory violations complained of fall squarely within the express purview of the DSS. Accordingly, the DSS is the appropriate entity to assess the Vi's compliance with the relevant statutes and, if necessary, bring an action against some or all of the defendants for any violation(s) thereof. Thus, a continuing care community cannot simply flout its statutory responsibilities with abandon – evading repercussion because the individual residents cannot yet point to a direct harm. Rather, the DSS is charged with ensuring such communities comply with the statutory protections.

Only one section of the Code provides that an entity may be directly liable to an injured

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

United States District Court
Northern District of California

resident.  Section 1793.5 states

> An entity that abandons a continuing care retirement community or its obligations under a continuing care contract is guilty of a misdemeanor. An entity that violates this section shall be liable to the injured resident for treble the amount of damages assessed in any civil action brought by or on behalf of the resident in any court having proper jurisdiction. The court may, in its discretion, award all costs and attorney fees to the injured resident, if that resident prevails in the action

Cal. Health & Safety Code § 1793.5(d).  Violation of this section is a *per se* act of unfair competition under the UCL.  Cal. Health & Safety Code § 1793.5(h).  Accordingly, a private right of action does exist for residents of a CCRC, but only where the entity has abdicated its responsibilities to the community in such an egregious manner that it rises to the level of criminal liability.

Here, Plaintiffs continue to reside at the Vi and have not alleged that CC-PA or any named defendant has "abandoned" the community or contravened its contractual obligations to the community.  At best, Plaintiffs' allegations suggest that Defendants may be unable to meet these obligations in the future.  Thus, Plaintiffs' contentions fall far short of the severe circumstances contemplated by Section 1793.5.

Based on the foregoing, Plaintiffs fail to plead an injury to any legally protected interest. Although the Residency Contracts are refundable contracts pursuant to the California Health & Safety Code, and thus subject to the refund reserve requirements, no plaintiff has been denied a repayment to which they were entitled under the Contract.  The alleged statutory violation, in and of itself, is insufficient to confer standing.  Rather, the DSS is the proper entity to enforce the non-compliance with the refund reserve requirement or other provisions of the statutes governing CCRCs.  Thus, to the extent that Plaintiffs' claims are based on Defendants' non-compliance with the refund reserve requirement, Plaintiffs lack standing.

### iii.    Conclusion

For the foregoing reasons, Plaintiffs have not alleged the injury in fact necessary for standing as to either the monthly fees or the entrance fees.  Plaintiffs' claims that rely on these fees

United States District Court
Northern District of California

as the basis for injury or damages therefore fail.  Consequently, Defendants' Motions to Dismiss are GRANTED with respect to the following claims:

- Plaintiffs' First Cause of Action for Financial Abuse of Elders.  The "property" that Plaintiffs allege they were wrongfully deprived of is the money from the inflated monthly fees and the entrance fees.  See FAC ¶ 195.  Because no independent injury is alleged, Plaintiffs lack standing.  See Cal. Welf. & Inst. Code § 15610.30(b)-(c)

- Plaintiffs' Fourth Cause of Action for Breach of Fiduciary Duty and Constructive Trust.  The only damages alleged in connection with this cause of action relate to CC-DG "wrongfully acquir[ing] Plaintiffs' Entrance Fees."  FAC ¶¶ 226-227.  Thus, to the extent that Defendants had a fiduciary duty to Plaintiffs, Plaintiffs have no damages and therefore have no standing.

- Plaintiffs Sixth and Seventh causes of action for violations of the California Business & Professions Code.  Plaintiffs seek restitution and disgorgement of all earnings, profits, compensation and benefit obtained by Defendants as a result of their unlawful conduct, as well as injunctive relief to prevent any further upstreaming of funds from CC-PA to CC-DG.  FAC ¶¶ 249, 260.  The UCL defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  "By proscribing any 'unlawful' business practice, the UCL 'borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  Herriot v. Channing House, No. C 06-6323, 2008 WL 3929214, at *5 (N.D. Cal. Aug. 26, 2008) (citing Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999)).  The merit of a UCL claim is therefore predicated on the merit of the allegations on which it is based.  Because Plaintiffs cannot prevail on any of the other claims raised in connection with their

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

United States District Court
Northern District of California

1    UCL claims, Plaintiffs' UCL claims also fail. [8]

2    •   Plaintiffs' Eighth and Ninth causes of action for Breach of Contract and Breach of

3        the Implied Covenant of Good Faith and Fair Dealing.  Plaintiffs argue that the

4        California Health & Safety Code provisions governing refundable contracts are

5        incorporated into Plaintiffs' Residency Contracts by operation of law, and by

6        failing to maintain the required financial reserves, CC-PA breached its contractual

7        obligations to Plaintiffs and the Class.  FAC ¶ 265.  Plaintiffs are incorrect.  They

8        cite no authority for the proposition that the numerous federal, state, and local

9        regulations with which a business entity must comply do not necessarily become an

10       implied term of a third party's contract with the entity such that a private right is

11       action is created when none is provided by under the law.  Similarly, Plaintiffs'

12       claim for Breach of the Implied Covenant of Good Faith and Fair Dealing  alleges

13       that CC-PA "unfairly interfer[ed] with Plaintiffs and the Class' rights to receive

14       benefits under the contract" by failing to comply with the refund reserve

15       requirement, upstreaming the entrance fees, requiring them pay inflated monthly

16       fees, and denying them a role in board activities.  FAC ¶ 195.  Plaintiffs therefore

17       rely on allegations that fail state an injury in fact or fail to confer a private right of

18       action in Plaintiffs.  Accordingly, Plaintiffs lack standing to assert these claims.

19   **B.     Sufficiency of the Remaining Causes of Action**

20       The Court now turns to whether Plaintiffs state a plausible claim with respect to any other

21   cause of action.  In addition to challenging Plaintiffs' claims on the basis of standing, Defendants

22

23   [8] Plaintiffs identify Financial Abuse of Elders and purported violations of Health & Safety Code §§ 1771.8, 1792.6, 1793, 1793.5(d)(f) as the unlawful conduct giving rise to the UCL claims.

24   Section 1771.8 is the only section not expressly addressed elsewhere in this Order, and it requires CCRCs to hold meetings with residents in order to provide them with relevant information.

25   However, Plaintiffs do not allege that CC-PA failed to hold the residential meetings required by this provision.  See FAC ¶¶ 107, 112, 160.  And even if Plaintiffs had properly alleged that these

26   meetings had not taken place, obligations such as when to hold meetings are CCRC business practices that are best regulated by the DSS.  Section 1793.5 is a *per se* violation of the California

27   Business & Professions Code, however, as explained above, Plaintiffs fail to sufficiently allege any violation thereof. See Section A(ii)(d), *supra*.

28
                                                                24
     Case No.: 5:14-cv-00750-EJD
     ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

United States District Court
Northern District of California

also move to dismiss each of Plaintiffs' substantive claims for failure to state a claim upon which relief can be granted.

### i. Concealment

Plaintiffs Second Cause of Action alleges Concealment based on the failure to disclose important facts related to CC-PA's assessment of the monthly fees and management of the entrance fees.

To state a claim for concealment, a plaintiff must allege: (1) the concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) that the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) that the plaintiff was unaware of the fact and would have acted differently if he or she had known of the concealed or suppressed fact; and (5) that the plaintiff sustained damage as a result of the concealment or suppression of the fact.  Graham v. Bank of America, N.A., 226 Cal. App. 4th 594, 606 (2014).

Here, Plaintiffs identify seven "facts" related to the monthly fees and the entrance fees that they contend Defendants had a fiduciary duty to disclose to them.  FAC ¶¶ 203-204(a)-(g). Specifically, Plaintiffs contend that Defendants allocated improper costs to residents by way of the monthly fees, as well as concealed their intention to upstream the entrance fees and keep CC-PA "dangerously underfunded."  FAC ¶ 204.  With respect to the monthly fees, the Residency Contract's language directly contradicts Plaintiffs' claim of concealment.  As discussed above, given the comprehensive explanation of the fee structure provided in the Contract, Plaintiffs cannot plausibly allege that Defendants failed to disclose important facts regarding the monthly fees residents would be required to pay.

With respect to the entrance fees, Plaintiffs fail to allege how they would have behaved differently had the purportedly omitted information been disclosed to them.  That is, had Plaintiffs known that CC-PA would transfer a sizable portion of their entrance fees to its corporate parent, Plaintiffs do not state they would have rejected the Residency Contract or declined to reside at the Vi.  Rather, Plaintiffs merely claim that they "reasonably relied on Defendants actions," which

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

United States District Court
Northern District of California

1    they echo with no further explanation in their Opposition.  FAC ¶ 205; Opp. at 15.  This is

2    insufficient for a concealment claim.

3            Moreover, Plaintiffs also do not demonstrate in what way they sustained any injury as a

4    result of not knowing the allegedly concealed facts.  Instead, Plaintiffs contend that they "have

5    been damaged because their security interest has been impaired and they have been overcharged."

6    Opp. at 15.  For the reasons discussed above with respect to standing, this fails to satisfy the

7    damages requirement and Plaintiffs therefore have not stated a claim for concealment.

8                    **ii.    Negligent Misrepresentation**

9            Plaintiffs Third Cause of Action alleges Defendants' negligent misrepresentation of

10   important facts related to CC-PA and the Vi.

11           To state a claim for negligent misrepresentation, a plaintiff must plead: (1) the defendant

12   misrepresented a past or existing material fact; (2) without reasonable ground for believing it to be

13   true; (3) with intent to induce the plaintiff's reliance on the misrepresented fact; (4) the plaintiff's

14   actual reliance on the misrepresentation; and (5) resulting damage.  <u>Apollo Capital Fund LLC v.

15   Roth Capital Partners, LLC</u>, 158 Cal. App. 4th 226, 243 (Cal. App. 2007).  Rule 9(b)'s heightened

16   pleading standard applies to negligent misrepresentation claims because the claim is based in

17   fraud.  <u>See</u> <u>Vess</u>, 317 F.3d at 1103.

18           Here, Plaintiffs offer two primary examples of Defendants' alleged misrepresentations.

19   <u>See</u> Opp. at 25-26.  First, Plaintiffs identify a marketing brochure containing a question and

20   answer segment on the regulation of CCRCs and the management of entrance fees and deposits.

21   Specifically, Plaintiffs highlight a portion of the brochure's statement that indicates the funds from

22   residents entrance fees will "remain in the escrow account until the community proves it has met

23   stringent State requirements."  <u>Id.</u> at 26.  This brochure also states that the DSS monitors and

24   regulates CCRC and implies that this oversight creates added financial security for residents.  <u>See</u>

25   FAC ¶¶ 91-91.  Second, Plaintiffs point to a statement made in a marketing letter from Classic

26   Residence by Hyatt to Residents dated October 9, 2008 (the "October Letter").  The statement

27   reads:

28

United States District Court
Northern District of California

> [Residents experience] a sense of security, knowing they have made a good choice. They know their entrance fee refund will not fluctuate with changes in the market…. Our residents enjoy a vibrant and enriching lifestyle with the knowledge that they have planned wisely to secure their future.

FAC ¶ 210.  Plaintiffs allege that Defendant CC-PA represented to Plaintiffs that "their Entrance Fees would be used to provide services" and that these statements are not true.  FAC ¶¶ 211-212.

Defendants contend that Plaintiffs fail to allege an actual misrepresentation or reliance. Corp. MTD at 18.  Defendants argue that the FAC is "devoid of any alleged facts to demonstrate (1) each plaintiff received the letter, (2) when he or she received it, (3) why the statement was untrue, (4) that they relied on the alleged misrepresentation contained therein, (5) why that reliance was reasonable, and (6) that each individual plaintiff would not have entered the community but for the alleged misrepresentation."  Id.

The Court agrees with Defendants because Plaintiffs have not plausibly alleged that the identified statements are false.  As to the marketing brochure, Plaintiff does not allege that the DSS does *not* monitor and regulate CCRCs or that CC-PA somehow marketed itself as being subject to this monitoring when it in fact is not.  To the contrary, as Plaintiffs own statements indicate, the DSS expressly engaged CC-PA in the course of monitoring the Vi and its financials. See FAC ¶ 21 (stating that financial concerns "have also been raised by the Department of Social Services," and referencing a Letter from Robert Thompson, dated August 2, 2012, attached to Plaintiffs FAC as Exhibit 5).  As to the October Letter, the general, self-promotional material boasting wise planning and financial security provides an insufficient basis for a negligent misrepresentation claim.  See Evan F. v. Hughson United Methodist Church, 8 Cal. App. 4th 828, 841 n. 2 (1992) (holding that "[m]isrepresentations must be positive assertions, not implied statements").

Moreover, as was the case with respect to the concealment claim, Plaintiffs have failed to allege actual reliance or damages.  There are no particular allegations as to what Plaintiffs actually relied on in these statements or how Plaintiffs would have acted differently but for the misrepresentation.  As Defendants point out, four of the six plaintiffs entered the community

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

1   *before* the October Letter was even published in 2008.  See Reply at 14.  Plaintiffs contend that

2   the same language was used prior to 2008, but even if true, the fact remains that Plaintiffs do not

3   plead facts suggesting actual reliance or the damages resulting from this reliance.  Accordingly,

4   Plaintiffs have failed to state a claim for negligent misrepresentation.

5            iii.   **CLRA**

6            Plaintiffs' Fifth Cause of Action alleges violations of the CLRA, which prohibits "unfair

7   methods of competition and unfair or deceptive acts or practices undertaken by any person in a

8   transaction intended to result or which results in the sale or lease of goods or services to any

9   consumer."  Cal. Civ. Code § 1770(a); Wilson v. Hewlett–Packard Co., 668 F.3d 1136, 1140 (9th

10  Cir. 2012).  This prohibition bars representations that "goods ... have characteristics which they do

11  not have," or "are of a particular standard, quality, or grade ... if they are of another."  Cal. Civ.

12  Code §§ 1770(a)(5), (7).  It likewise bars the omission of any material fact relating to those goods.

13  See LiMandri v. Judkins, 52 Cal. App. 4th 326, 337 (1997).  The Ninth Circuit has held that "rule

14  9(b)'s heightened pleading standards apply to claims for violations of the CLRA" when such

15  claims are grounded in fraud.  Vess, 317 F.3d at 1102-05.

16          Under California Civil Code Section 1780(a), "CLRA actions may be brought by a

17  consumer 'who suffers any damage as a result of the use or employment' of a proscribed method,

18  act, or practice."  MacRae v. HCR Manor Care Servs., No. SACV 14-0715-DOC, 2014 WL

19  3605893, at *3 (C.D. Cal. July 21, 2014) (quoting Durell v. Sharp Healthcare, 183 Cal. App. 4th

20  1350, 1367(2010)).  Therefore, to state a claim under the CLRA, a plaintiff must show that: (1) a

21  consumer is exposed to an unlawful business practice, and (2) the consumer is damaged by the

22  unlawful practice.  Id. at *3.  Additionally, a CLRA claim based in fraud requires reliance.  Id.

23          Here, Plaintiffs' CLRA claim seems to rely on the same information set forth in connection

24  with their negligent misrepresentation cause of action.  Plaintiffs allege that Defendants'

25  "practices in connection with the marketing and sales of CCRC residential and financial

26  management services … violate the CLRA" by knowingly misrepresenting and falsely advertising

27  the character and quality of the services offered.  FAC ¶ 234; Cal. Civ. Code § 1770(a)(5), (7), (9),

28

28

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

(14).

These allegations lack the particularity required by Rule 9(b) and fail to state a CLRA claim.  Plaintiffs do not contend that the quality of services they were promised were materially different from what they ultimately received at the Vi.  See § 1770(a)(5), (7).  And as to the contention that Defendants' advertising was misleading, or that the public statements misrepresented the legal rights and obligations related to the entrance fees and allocated expenses, the allegations fail to establish deception for the same reasons discussed in conjunction with the negligent misrepresentation claim.  See 1770(a)(9), (14).  Plaintiffs argue that they "were lured into the Vi at Palo Alto by Defendants' assurances of financial security."  Opp. at 31.  But Plaintiffs have not plausibly alleged financial insecurity - that is, as already explained, the FAC's allegations do not establish that Plaintiffs' entrance fees are will not being repaid to them when they come due.  Plaintiffs allegations therefore fail to "set forth what is false or misleading about [the] statement, and why it is false."  See Vess, 317 F.3d at 1106.  Finally, even if Plaintiffs had successfully alleged deception and reliance, Plaintiffs have not alleged damages.  Consequently, Plaintiffs fail to state a claim under the CLRA.

### iv.    Declaratory Relief

In addition to claims for damages and injunctive relief, Plaintiffs also request "a declaration of the rights and responsibilities of the parties" with respect to the California Health & Safety Code and the Delaware Corporations Code.  FAC ¶ 200(a)-(g).

A complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the respective parties and requests that these rights and duties be adjudged by the court.  Cal. Code Civ. Proc. § 1060; Maguire v. Hibernia Sav. & Loan Soc., 23 Cal. 2d 719, 728 (1944).  Federal courts may exercise jurisdiction over declaratory relief actions that are premised on state law.  See McWilliams v. Hopkins, 11 F.2d 793, 795 (S.D. Cal 1926) (finding jurisdiction appropriate as long as diversity and jurisdictional amounts were satisfied).

However, a claim for declaratory relief "may be refused in the discretion of the trial court

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

1    if it appears that the determination is not necessary or proper at the time and under all the

2    circumstances."  Moss v. Moss, 20 Cal. 2d 640, 642 (1942); Cal. Code of Civ. Proc. § 1061.

3    Additionally, a court may dismiss a declaratory relief claim if the claim is duplicative of, or

4    substantially similar to, relief sought under another cause of action.  See Mangindin v. Washington

5    Mut. Bank, 637 F. Supp. 2d 700, 707–08 (N.D. Cal. 2009) (holding that "[a] claim for declaratory

6    relief is unnecessary where an adequate remedy exists under some other cause of action"); see also

7    City of Cotati v. Cashman, 29 Cal.4th 69, 80 (2002) (dismissing plaintiff's declaratory relief claim

8    as duplicative of and unnecessary because the claim was "commensurate with the relief sought

9    through the other causes of action").

10       Here, Plaintiffs argue that "only an order of declaratory relief will prevent Defendants from

11   relying on the same legal misinterpretations and therefore engaging in the same illegal conduct in

12   the future."  Opp. at 33.  Defendants contend that this claim should be dismissed because there is

13   no actual controversy and, even if there were, resolution of the other claims clarifies the legal

14   relationships at issue.  Corp. MTD at 26.

15       The Court agrees that Plaintiffs' claim for declaratory relief should be dismissed for three

16   reasons.  First, because Plaintiffs do not have standing for claims underlying the alleged "illegal

17   conduct," there is no controversy relating to the "legal rights and duties of the respective parties."

18   Cal. Code Civ. Proc. § 1060.  That is, given that Plaintiffs have not alleged a legal protected

19   interest or right, there is no controversy relating to *their* legal rights.  At most, Plaintiffs allege a

20   controversy over the legal duties of Defendants under laws that do not provide a private right of

21   action, which is insufficient.

22       Second, to the extent that a justiciable controversy existed, the Court's earlier finding that

23   the Residency Contract is a refundable contract under California law clarifies any ambiguity as to

24   Defendants statutory obligations, rendering this claim unnecessary and duplicative.

25       Third and finally, even if Plaintiffs alleged a more concrete controversy regarding the

26   rights and duties of Defendants, the Court may nonetheless exercise its discretion to dismiss this

27   claim on the grounds that that such a determination by this Court is "not necessary or proper at the

28

30

United States District Court
Northern District of California

1  time and under all the circumstances." See Moss, 20 Cal. 2d at 642.  As previously noted, the DSS

2  is the agency designated to oversee CCRCs in California.  Consequently, the DSS is the entity

3  most familiar with the business structure of the Vi, as well as the regulations with which it must

4  comply based on this structure.  It is also responsible for reviewing the Vi's compliance with these

5  regulations on a continuing basis.  In light of this, the Court views the DSS as the agency best

6  equipped to make initial assessments regarding Defendants' compliance – or lack thereof – with

7  the relevant law and finds that a declaration of the parties' respective rights and obligations an

8  improper matter for this court to evaluate.

9       Accordingly, Plaintiffs' Tenth Cause of Action for a declaratory judgement is dismissed.

10      **v.    Derivative Claims**

11      Plaintiffs' Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth causes of action assert

12  derivative claims on behalf of CC-PA against the Director Defendants and/or Defendant CC-GD.[9]

13  Typically, a derivative action is an equitable remedy available to shareholders of a corporation

14  who seek damages on behalf of the corporation itself.  See N. Am. Catholic Educ. Programming

15  Found., Inc. v. Gheewalla, 930 A.2d 92, 101-02 (Del. 2007).  Plaintiffs do not allege that they are

16  shareholders of CC-PA, but rather bring these derivative claims as creditors of CC-PA.

17      There is no dispute between the parties that under controlling law, "equitable

18  considerations give creditors of a corporation standing to pursue derivative claims, but only if the

19  company is insolvent."  Opp. to Director MTD at 8; Director MTD at 2-3; see Torch Liquidating

20  Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill, 561 F.3d 377, 385 (5th Cir. 2009) (holding

21  "[u]nder Delaware law, a claim alleging the directors' or officers' breach of fiduciary duties owed

22  to a corporation may be brought by the corporation or through a shareholder derivative suit when

23  the corporation is solvent or a creditor derivative suit when the corporation is insolvent.");

24  Gheewalla, 930 A.2d at 101 (explaining that when corporation is solvent, the fiduciary duties

---

[9] Plaintiff alleges claims for Creditor Claim for Breach of Fiduciary Duties Against the Director Defendants; Creditor Claim for Breach of Fiduciary Duties of in the alternative Aiding and Abetting the Director Defendants' Breach of Fiduciary Duties; Payment of Unlawful Dividends; Fraudulent Transfer of Assets; and Corporate Waste, respectively.

United States District Court
Northern District of California

United States District Court
Northern District of California

owed by directors of a corporation may be enforced by its shareholders, but "[w]hen a corporation is *insolvent ...* its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.") (emphasis in original).  Accordingly, the sufficiency of the derivative claims alleged herein depends upon whether Plaintiffs have sufficiently alleged that CC-PA is insolvent, thereby conferring standing to Plaintiffs as creditors of CC-PA.

A plaintiff may plead insolvency by either showing "(1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business."  Id. at 98; Quadrant Structured Prods. Co. v. Vertin, 102 A.3d 155, 176 (Del. Ch. 2014) reconsideration denied sub nom. Quadrant Structured Prods. Co., Ltd. v. Vertin, No. CIV.A. 6990-VCL, 2014 WL 5465535 (Del. Ch. Oct. 28, 2014).  The Delaware Court of Chancery explained in Quadrant that "[i]n a mature company, the existence of a great disparity between assets and liabilities at least raises an issue of material fact as to whether the company was insolvent" such that it might survive a motion to dismiss."  Id. at 176-77 (internal quotations omitted).  In Quadrant, the court found that the plaintiff had successfully pled that the company was insolvent based in large part on the determination that "the Company ha[d] no realistic prospect of returning to solvency."  Id. at 177.

Citing a 2012 actuarial study commissioned by Defendant CRMLP, Plaintiffs here contend that CC-PA has "liabilities far in excess of assets and that CC-PA's expected income stream will not cover liabilities."  Opp. to Director MTD at 12.  Plaintiffs rely on Quadrant, alleging that the actuarial study here "demonstrates the insolvency of CC-PA under both a 'balance sheet' test and a 'cash flow' test."  Id.  Plaintiffs also excerpt extensive portions of the letter from the DSS expressing concerns regarding CC-PA's financial status, which Plaintiffs suggest further demonstrate CC-PA's insolvency.  Id. at 12-13.  Arguing that they have alleged sufficient facts to survive a motion to dismiss, Plaintiffs ultimately contend that insolvency is a question of fact that is inappropriate to resolve at the pleading stage.  Id. at 15.

Defendants respond that Plaintiffs fail to plead insolvency because Plaintiffs' own

United States District Court
Northern District of California

1   documents demonstrate that CC-PA has a positive cash flow and is otherwise financially stable.

2   Director Reply at 8 (referencing FAC, Ex. 2 at 4 and Ex. 5 at 1-2).  Defendants distinguish

3   Quadrant by pointing out that unlike a situation where the allegations established that a company

4   had "no realistic prospect of returning to solvency," the evidence presented by Plaintiffs here

5   expressly demonstrates that CC-PA can, or likely will be able to, meet its obligations when they

6   come due.  Director MTD at 6; see Quadrant, 102 A.3d at 177.  Defendants argue that Plaintiffs

7   allegations are insufficient to plead insolvency because: (1) a balance sheet deficit alone is

8   insufficient to demonstrate insolvency; (2) the allegations show that the entrance fee loans are not

9   currently due; and (3) the allegations further demonstrate the CC-PA has multiple sources of

10  prospective funding to repay the loans, including entrance fees from new residents and funding

11  from CC-DG, both of which have occurred in the past to allow CC-PA to meet previous

12  repayment obligations.  Director MTD at 7.

13       The Court agrees with Defendants.  Neither the DSS letter nor the actuarial study make

14  specific finding as to insolvency.  Rather, upon review of the actuarial study, the DSS frames the

15  issue as "whether CC-PA's distributions of cash to its non-provider parent have weakened CC-

16  PA's financial position so that it is (or the Department may have reason to believe that it is)

17  insolvent, is in imminent danger of becoming insolvent, is in a financially unsound or unsafe

18  condition, or that its condition is such that it may otherwise be unable to fully perform its

19  obligations pursuant to continuing case contracts."  Opp. to Director MTD at 12.  This letter

20  suggests that DSS has concerns about CC-PA's present financial circumstances, but an expression

21  of concern does not rise of the level of establishing insolvency.  If anything, the letter may show

22  that DSS oversight is functioning as intended under the California Health & Safety Code – that

23  DSS is taking seriously its responsibility to monitor CCRC financial reports and making efforts to

24  address potential issues *before* irreparable harm, such as insolvency, occurs.

25       Moreover, as previously discussed at length, Plaintiffs have not alleged that any entrance

26  fee loan is presently due to any resident under the Contract.  Rather, all named plaintiffs currently

27  live at the Vi and no plaintiff has terminated his or her Contract at the time of this action.  Thus,

28  

33

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

United States District Court
Northern District of California

1   there is no plausible suggestion that CC-PA is incapable of meetings its current financial

2   obligations.  With respect to future obligations, the facts alleged indicate CC-PA's business model

3   provides for multiple potential sources of funding through which CC-PA may reasonably be able

4   to satisfy prospective debts that come due.  Consequently, even under the most generous reading

5   of the FAC, Plaintiffs' allegations fail to demonstrate that CC-PA has "no reasonable prospect" of

6   continuing in the face of its present asset deficiency, or that it has "an inability to meet maturing

7   obligations as they fall due in the ordinary course of business."  See Gheewalla, 930 A.2d at 98.

8   Plaintiffs therefore fail to plead insolvency.

9          Without alleged facts to establish insolvency, Plaintiffs lack standing to bring a derivative

10  suit as creditors of CC-PA and the Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth causes

11  of action must be dismissed.

12  **IV.     CONCLUSION**

13         For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED as follows:

14         1.      The claims for (1) Financial Abuse of Elders; (2) Concealment; (3) Negligent

15  Misrepresentation; (4) Breach of Fiduciary Duty and Constructive Trust; (5) violation of the

16  CLRA; (6) violation of the UCL seeking restitution and discouragement; (7) violation of the UCL

17  injunctive relief; and (8) Breach of Contract are DISMISSED WITHOUT LEAVE TO AMEND.

18  At this point, allowing for further amendment would be futile because Plaintiffs have failed to

19  establish standing in either of their pleadings.  See Foman v. Davis, 371 U.S. 178, 182 (1962); see

20  also Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008) (holding that leave

21  to amend may be denied for "failure to cure deficiencies by amendments previously allowed").

22         2.      Similarly, because they rely on the same alleged injuries that do not to confer

23  standing with respect to the above claims, the claims for (9) Breach of the Implied Covenant of

24  Good Faith and Fair Dealing and (10) declaratory relief are also DISMISSED WITHOUT LEAVE

25  TO AMEND because allowing for the amendment would be futile.

26         3.      The newly-asserted claims for (11) Creditor Claim for Breach of Fiduciary Duties

27  Against the Director Defendants; (12) Creditor Claim for Breach of Fiduciary Duties or in the

28

alternative Aiding and Abetting the Director Defendants' Breach of Fiduciary Duties; (13) Payment of Unlawful Dividends; (14) Fraudulent Transfer of Assets; and (15) Corporate Waste are DISMISSED WITH LEAVE TO AMEND.

Any amended complaint must be on or before **April 15, 2016.**

Plaintiffs are advised that, although leave to amend has been permitted with respect to these claims, Plaintiffs may not add new claims or new parties to this action without first obtaining Defendants' consent or leave of Court pursuant to Federal Rule of Civil Procedure 15.  Plaintiffs are further advised that failure to timely file an amended complaint or failure to amend the complaint in a manner consistent with this Order may result in the dismissal of this action without further leave to amend.


**IT IS SO ORDERED.**

Dated: March 31, 2016

EDWARD J. DAVILA
United States District Judge