UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BURTON RICHTER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CC-PALO ALTO, INC., et al.,<br><br>Defendants. | Case No. 5:14-cv-00750-EJD<br><br>**ORDER:**<br><br>**GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE;**<br><br>**DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND**<br><br>**GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 93, 95, 96 |

Plaintiffs Burton Richter, Linda Collins Cork, Georgia L. May, Thomas Merigan, Alfred Spivack, and Janice R. Anderson (collectively, "Plaintiffs") bring this suit individually, on behalf of a proposed class, and derivatively as creditors, against CC-Palo Alto, Inc. ("CC-PA"), CC-Development Group, Inc. ("CC-DG"), and Classic Residence Management Limited Partnership (the "Corporate Defendants"), as well as members of CC-PA's board of directors, namely Penny Pritzker, Nicholas J. Pritzker, John Kevin Poorman, Gary Smith, Stephanie Fields, and Bill Sciortino (the "Director Defendants"). Following the dismissal of the prior version of their pleading, Plaintiffs timely filed a Second Amended Class Action and Creditor Derivative

1

1  Complaint ("SAC"). Dkt. No. 89.

2  The Director Defendants and Corporate Defendants now separately move to dismiss the SAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. Nos. 93, 95. The Corporate Defendants also move to strike several previously-dismissed causes of action under Federal Rule of Civil Procedure 12(f). Dkt. No. 96.

Federal jurisdiction arises pursuant to 28 U.S.C. § 1332. Having reviewed the relevant pleadings as well as the history of this action, the court has determined that the motion to strike should be granted, but the motions to dismiss denied, for the reasons explained below.

## I. BACKGROUND

### A. Continuing Care Retirement Communities

"Continuing care retirement communities," or "CCRCs," are a specialized kind of residential retirement community, offering elderly residents a flexible "continuum of care" as they age. SAC, at ¶ 4. Incoming residents typically live independently in their own apartment when they first enter the community. Id. However, should a resident come to require a greater degree of care, CCRCs also provide on-site assisted living, memory support, and skilled nursing facilities. Id.

### B. The Parties

Plaintiffs are residents of a CCRC known as the Vi at Palo Alto. SAC at ¶ 1. The Vi is owned and operated by CC-PA, a Delaware corporation with its principle place of business in Palo Alto, California. Id. at ¶ 35. CC-DG, a Delaware corporation with its principle place of business in Chicago, is CC-PA's corporate parent. Id. at ¶ 36. CC-DG was formed by Penny Pritzker in 1987 and currently operates nine other CCRCs throughout the United States in addition to the Vi. Id.

The Director Defendants are Illinois residents who are, or previously were, members of CC-PA's Board of Directors during the time period relevant to this action. Id. at ¶¶ 37-45. Plaintiffs contend that all named Director Defendants "participated in the management of CC-PA,

2
Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

and conducted and culpably participated, directly and indirectly, the conduct of CC-PA's business affairs." Id. at ¶¶ 38-43. Plaintiffs also allege the Director Defendants "have, and at all relevant times had, the power to control and influence and did control and influence and cause CC-PA to engage in the practices complained of." Id. at ¶ 44.

### C. The Residency Contract and Entrance Fees

To live at the Vi, residents enter into a Continuing Care Residency Contract with CC-PA. Id. at ¶ 15. Pursuant to the terms of the Contract, residents are required to pay a one-time entrance fee as well as recurring monthly fees.

The entrance fee made to CC-PA can range from several hundred thousand to several million dollars. Id. The fee is characterized as a "loan" to CC-PA, a portion of which is to be repaid to the resident or the resident's estate when the Contract terminates. Id. at ¶¶ 15-16. A resident's Contract terminates when the resident decides to leave the Vi or when the resident passes away. Id. at ¶ 81.

The terms of the entrance fee "loan" are governed by an "Entrance Fee Note," which residents are given at the time of payment. Id. at ¶¶ 15, 77. Upon termination of the Contract, the repayable portion of the entrance fee is due at the earlier of: (i) fourteen days after resale of the resident's apartment; or (ii) ten years after termination. Id. at ¶ 16. The amount of the entrance fee that is repaid depends on the date the resident entered the community, as the repayable percentage has decreased over time. Id. at ¶¶ 16, 78. However, about 70% to 90% of the entrance fee amount is refunded to the resident upon termination in accordance with the above conditions. Id. at ¶ 16.

Since the Vi's opening in 2005, Plaintiffs allege they have collectively loaned Defendants over $450 million in the form of entrance fees. Id. at ¶ 15. Instead of safeguarding these fees in a reserve, Plaintiffs allege that as of December 2013, CC-PA had transferred, or "upstreamed," over $219 million acquired from the entrance fees to CC-DG without obtaining security or any repayment promise. Id. at ¶ 21. As a result, Plaintiffs allege that CC-PA will be financially

3

incapable of honoring its debts when they become due. Id.

### D. CC-PA's Financial Condition

The SAC alleges that at all relevant times since CC-PA admitted its first residents in 2005, CC-PA's liabilities have exceeded the reasonable market value of its assets. Id. at ¶ 99. Plaintiffs allege that CC-PA's 2014 financial statements show the following:

> "Total Stockholders Deficit" (i.e., negative net worth) had increased from ($106,317,195) at December 31, 2005 to ($315,342,106) at December 31, 2014. At the same time, during the period from 2005 through December 31, 2013, CC-PA's obligations to residents entering the Community under CC-PA's Entrance Fee Notes had increased from $307,288,000, at December 31, 2005, to $462,502,000, at December 31, 2014.

Id.

Plaintiffs further allege that in each year from 2005 through 2014, CC-PA had insufficient funds to repay its borrowing from residents and as a result, it "has been forced to ask for cash from CC-DG to enable CC-PA to pay its maturing obligations." Id. at ¶ 102. While Plaintiffs acknowledge that "CC-DG has voluntarily made such advances," Plaintiffs contend that CC-DG denies that it had any obligation to do so in the future. Id. Finally, Plaintiffs allege that "[b]eginning in 2005, following receipt of borrowed Entrance Fees from the first residents entering the Community, and in each year thereafter through 2014, CC-PA distributed to CC-DG . . . millions of dollars in dividends of CC-PA's liquid funds from borrowed Entrance Fees." Id. at ¶ 103. Plaintiffs assert that CC-PA has continued to make such distributions to CC-DG, and "CC-DG denies any obligation to return these distributions, regardless of CC-PA's financial condition or needs." Id.

### E. Procedural Background

Plaintiffs' original Complaint was filed on February 19, 2014. Dkt. No. 1. Defendants filed a motion to dismiss that pleading, which the court granted with leave to amend. Dkt. Nos. 13, 55.

Plaintiffs then filed a First Amended Complaint, reasserting the dismissed causes of action

4

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

and alleging several new ones. Defendants again moved to dismiss. Dkt. Nos. 68, 73. The court granted those motions, and dismissed Plaintiff's first ten causes of action without leave to amend. Dkt. No. 88. The remaining claims were dismissed with leave to amend.

Plaintiffs then filed the SAC reasserting all previously-pled causes of action, including those dismissed without leave to amend. Dkt. No. 89. The instant motions followed.

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1)

Standing is properly challenged through a Rule 12(b)(1) motion. White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000). Such a motion challenges subject matter jurisdiction, and may be either facial or factual. Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004).

A facial Rule 12(b)(1) motion involves an inquiry confined to the allegations in the complaint. Thus, it functions like a limited-issue motion under 12(b)(6); all material allegations in the complaint are assumed true, and the court must determine whether lack of federal jurisdiction appears from the face of the complaint itself. Thornhill Publ'g Co. v. General Tel. Elec., 594 F.2d 730, 733 (9th Cir. 1979).

### B. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations omitted). Although particular detail is not generally necessary, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Id. at 556-57. A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Dismissal of a claim under Rule 12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988); see Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104

5

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

(9th Cir. 2008).

At the motion to dismiss stage, the court must construe the complaint in the light most favorable to the non-moving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996). Additionally, the court must accept as true all "well-pleaded factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. Nor is a complaint sufficient if it merely "tenders naked assertions devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (internal quotation marks omitted). "In all cases, evaluating a complaint's plausibility is a context-specific endeavor that requires courts to draw on . . . judicial experience and common sense." Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Claims that sound in fraud are subject to a heightened pleading standard. Fed. R. Civ. Proc. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1103-1104 (9th Cir. 2003) (recognizing that claims "grounded in fraud" or which "sound in fraud" must meet the Rule 9(b) pleading standard, even if fraud is not an element of the claim). The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). This requires "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007). In other words, fraud or claims asserting fraudulent conduct must generally contain more specific facts than is necessary to support other causes of action.

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). However, the court may consider material submitted as part of

the complaint or relied upon in the complaint, and may also consider material subject to judicial notice. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).

### C. Federal Rule of Civil Procedure 12(f)

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Immaterial matter is "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir.1993), rev'd on other grounds, 510 U.S. 517 (1994) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 706-707 (1990)). Similarly, impertinent matter does not pertain, and is not necessary, to the issues in question. Id. "Redundant allegations are those that are needlessly repetitive or wholly foreign to the issues involved in the action." Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc., 217 F.Supp.2d 1028, 1033 (C.D.Cal.2002) (internal quotation marks and citations omitted).

## III. DISCUSSION

### A. The Motion to Strike

The court first takes up the Corporate Defendants' Motion to Strike. The Corporate Defendants argue that causes of action one through ten of the SAC should be stricken because they were previously dismissed without leave to amend. Dkt. No. 88. For their part, Plaintiffs acknowledge the dismissal of these causes of action but explain they replead the claims to "definitely" preserve them for appeal.

Plaintiff's exercise in preservation was unnecessary, because the Ninth Circuit has held that "claims dismissed with prejudice and without leave to amend . . . [are] not require[d] [to] be repled in a subsequent amended complaint to preserve them for appeal." Lacey v. Maricopa Cty., 693 F.3d 896, 928 (9th Cir. 2012). The court therefore finds the first ten causes of action are immaterial and impertinent to the remaining issues presented in this case. The Motion to Strike will be granted for that reason.

7

Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

## B. The Motions to Dismiss

With the previously dismissed claims stricken, the following causes of action remain:

| NUMBER | TITLE | AGAINST |
|---|---|---|
| 11 | Creditor Derivative Claim for Breach of Fiduciary Duties | Director Defendants |
| 12 | Creditor Derivative Claims for Breach of Fiduciary Duties or in the alternative, Aiding and Abetting the Director Defendants' Breaches of Fiduciary Duty | CC-DG |
| 13 | Creditor Derivative Claim for Payment of Unlawful Dividends | Director Defendants |
| 14 | Fraudulent Transfer of Assets | CC-DG |
| 15 | Creditor Derivative Claim for Corporate Waste | Director Defendants |

Defendants challenge these claims on several grounds under Rules 12(b)(1) and 12(b)(6). Each ground is discussed below, starting with those that arise under Rule 12(b)(1).

### i. Standing and Ripeness

#### a. General Principles

The constitutional standing doctrine "functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 191 (2000). This "case or controversy" requirement is jurisdictional and cannot be waived. City of Los Angeles v. Cty. of Kern, 581 F.3d 841, 845 (9th Cir. 2009). The party asserting federal jurisdiction must carry the burden of establishing standing under Article III. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006). And a plaintiff must at the pleading stage "clearly . . . allege facts" demonstrating each of these elements. Warth v. Seldin, 422 U.S. 490, 518 (1975).

Generally, the inquiry critical to determining the existence of standing under Article III of the Constitution is "'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" Allen v. Wright, 468 U.S. 737, 750-51 (1984) (quoting Warth, 422 U.S. at 498). Three basic elements must be satisfied: (1) an "injury in fact," which is neither

conjectural or hypothetical, (2) causation, such that a causal connection between the alleged injury and offensive conduct is established, and (3) redressability, or a likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Ripeness is a concept closely related to standing. Bova v. City of Medford, 564 F.3d 1093, 1096 (9th Cir. 2009). But while standing is concerned with the identity of the proper party to sue, ripeness is concerned with the proper timing of the litigation. Id. "[R]ipeness is peculiarly a question of timing . . . designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). "[I]n many cases, ripeness coincides squarely with standing's injury in fact prong," at least as a constitutional matter. Id. In fact, "[w]hether framed as an issue of standing or ripeness, the inquiry is largely the same: whether the issues presented are 'definite and concrete, not hypothetical or abstract.'" Wolfson v. Brammer, 616 F.3d 1045, 1058 (9th Cir. 2010). For this reason, it is sometimes characterized as "standing on a timeline." Bova, 564 F.3d at 1096.

"[T]he appropriate standard for determining ripeness of private party contract disputes is the traditional ripeness standard, namely, whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a . . . judgment.'" Principal Life Ins. Co. v. Robinson, 394 F.3d 665, 671 (9th Cir. 2005).

### b. Application to the SAC

On a facial Rule 12(b)(1) challenge, Defendants argue Plaintiffs lack standing to assert the causes of action that have not been otherwise stricken. They also argue the causes of action are not ripe for adjudication. These arguments are misguided.

The court first examines standing related to four derivative claims. The most common type of derivative action is one brought by shareholders, which is "an exception to the normal rule that the proper party to bring a suit on behalf of a corporation is the corporation itself, acting through its directors or a majority of its shareholders." Daily Income Fund, Inc. v. Fox, 464 U.S.

9
Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

523, 542 (1984). However, the parties do not dispute that equitable considerations give creditors of a corporation standing to pursue derivative claims when a company is insolvent. Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill, 561 F.3d 377, 385 (5th Cir. 2009). "Under Delaware law,[1] a claim alleging the directors' or officers' breach of fiduciary duties owed to a corporation may be brought by the corporation or through a shareholder derivative suit when the corporation is solvent or a creditor derivative suit when the corporation is insolvent." Id.; accord N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 101 (Del. 2007) (explaining that when corporation is solvent, the fiduciary duties owed by directors of a corporation may be enforced by its shareholders, but "[w]hen a corporation is *insolvent* . . . its creditors take the place of the shareholders as the residual beneficiaries of any increase in value."). Thus, Plaintiffs' standing to pursue derivative claims on behalf of CC-PA depends on the sufficiency of their allegations that CC-PA is insolvent.

A plaintiff can plead insolvency of a Delaware corporation under either the "cash flow" test or the "balance sheet" test. Quadrant Structured Prods. Co. v. Vertin, 102 A.3d 155, 176-77 (Del. Ch. 2014). Under the cash flow test, a corporation is considered insolvent when "it is unable to pay its debts as they fall due in the usual course of business." Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 789 (Del. Ch. 1992). Under the balance sheet test, "an entity is insolvent if it has liabilities in excess of a reasonable market value of assets held." Vertin, 102 A.3d at 176. "In a mature company, the existence of a great disparity between assets and liabilities at least raises an issue of material fact as to whether the company was insolvent such that it might survive a motion

---

[1] Delaware law applies under California's choice of law rules. See Atl. Marine Const. Co. v. Inc. v. U.S. Dist. Ct., 134 S. Ct. 568, 582 (2013) ("A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits."); Cal. Corp. Code § 2116 ("The directors of a foreign corporation transacting intrastate business are liable to the corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy for . . . violation of official duty according to any applicable laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere.").

to dismiss." Id. at 176-77 (internal quotations omitted).[2]

Utilizing the balance sheet test, Plaintiffs allege that CC-PA is insolvent by observing that CC-PA's liabilities have exceeded the reasonable market value of its assets since it first admitted residents. SAC, at ¶ 99. To that end, Plaintiff's point out that CC-PA's 2014 financial statements show its "negative net worth" had tripled, increasing from $106 million to $315 million. Id. Plaintiffs also allege that every year since 2005, "CC-PA has had insufficient funds to repay its borrowing from residents . . . as its obligations to such residents have matured upon death or departure of such residents." Id. at 102. Consequently, Plaintiffs allege that "CC-PA has been forced to ask for cash from CC-DG to enable CC-PA to pay its maturing obligations." Id. Presuming these allegations to be true and drawing all reasonable inferences in Plaintiffs' favor (Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987)), and considering the pleading's extensive attachments, the court finds the SAC plausibly describes that CC-PA is insolvent under Delaware law.[3] As such, Plaintiffs have satisfied their burden to plead standing to assert derivative claims as creditors.

Plaintiffs have also sufficiently pled standing to assert a cause of action for fraudulent transfer of assets. They allege that, in light of the Contract's repayment terms and the court's prior determination the Contract is refundable under California Health and Safety Code § 1771(r)(2),

---

[2] To the extent there is any confusion, the court clarifies it is not applying a standard of irretrievable insolvency since that standard "has never governed creditor-derivative claims." Quadrant Structured Prods. Co., Ltd. v. Vertin, 115 A.3d 535, 558 (Del. Ch. 2015).

[3] The court acknowledges the Director Defendants argument based on "real world" considerations of contingent liabilities, and observes the balance sheet test is framed in terms of comparing liabilities against the reasonable market value of assets. Vertin, 102 A.3d at 176. However, these fact-intensive inquiries simply cannot be resolved at this stage of the litigation. See Vertin, 115 A.3d at 552 (stating that "whether the corporation is solvent or insolvent is not a bright-line inquiry and often is determined definitively only after the fact, in litigation, with the benefit of hindsight"). Though the Director Defendants urge such an analysis, there is no feasible way for the court to value contingent liabilities in a "real world" way on a motion to dismiss. Thus, though Plaintiffs' have plausibly alleged CC-PA's insolvency as matter of pleading by, as the Director Defendants would require, supplying "specific facts to support a plausible basis from which to infer" a "real world" risk of insolvency, whether CC-PA is insolvent as a matter of fact will need to be revisited on summary judgment.

they qualify as "creditors" under California's Uniform Voidable Transfers Act, Civil Code § 3439.01, and under the corresponding Delaware statute - title 6, § 1301. The general purpose of these statutes is to remedy fraudulent conveyances, which are "transfer[s] by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim." Kirkeby v. Super. Ct., 33 Cal. 4th 642, 648 (2004). A "creditor" means "a person who has a claim." Cal. Civ. Code § 3439.01(c); Del. Code. Ann. tit. 6, § 1301(3). The SAC plausibly describes why Plaintiffs fit this definition.

Finally, the court rejects Defendants' ripeness argument based on prudential considerations that have questionable application to this action between private parties. See Principal Life Ins. Co., 394 F.3d at 670-71 (characterizing the prudential standing doctrine as "unique to cases involving administrative agencies," and finding "no legal or logical requirement" compelling its extension to private litigation). For constitutional purposes, the ripeness analysis largely coincides with the standing analysis. Thomas, 220 F.3d at 1138. Plaintiffs' creditor derivative claims are ripe because they allege the corporation has already suffered an injury in fact from Defendants' alleged breaches of fiduciary of duty; in other words, they are of "sufficient immediacy and reality" to warrant judicial consideration. Principal Life Ins. Co., 394 F.3d at 671. Similarly, the cause of action for fraudulent transfer of assets is based on Defendants' alleged completed and ongoing "upstreaming" activity to CC-DG and its effect on Plaintiffs, rendering this claim sufficiently concrete and, therefore, ripe.

In short, the SAC withstands Defendants' standing and ripeness challenges under Rule 12(b)(1).

### ii. Conflict of Interest

The Director Defendants' argue Plaintiffs' simultaneous pursuit of both class and derivative claims creates a "fatal" conflict of interest requiring dismissal. The court disagrees.

As relevant here, Federal Rule of Civil Procedure 23.1 states that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the

12
Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Rule 23.1 reflects the principle that "[a]n adequate representative must have the capacity to vigorously and conscientiously prosecute a derivative suit and be free from economic interests that are antagonistic to the interests of the class." Larson v. Dumke, 900 F.2d 1363, 1367 (9th Cir. 1990). Whether a conflict of interest actually exists in the adequacy of derivative representation requires a "fact intensive analysis" (Bryant v. Mattel, Inc., No. CV 04-9049 DOC (RNBx), 2010 WL 3705668, at *24-25 (C.D. Cal. Aug. 2, 2010)), though which the following factors may be considered:

> (1) indications that the plaintiff is not the true party in interest; (2) the plaintiff's unfamiliarity with the litigation and unwillingness to learn about the suit; (3) the degree of control exercised by the attorneys over the litigation; (4) the degree of support received by the plaintiff from other shareholders; (5) the lack of any personal commitment to the action on the part of the representative plaintiff; (6) the remedy sought by plaintiff in the derivative action; (7) the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action; and (8) plaintiff's vindictiveness towards the defendants.

Larson, 900 F.2d at 1367.

"These factors are 'intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1.'" Id. (quoting Davis v. Comed, Inc., 619 F.2d 588, 593-94 (6th Cir. 1980)).

The Director Defendants believe Rule 23.1's adequacy requirement is unsatisfied because "[t]he SAC shows that the very same Plaintiffs who are seeking to recover damages on behalf of CC-PA as CC-PA's creditors in the derivative claims are simultaneously seeking substantial relief against CC-PA" through direct class claims. This argument is unpersuasive, however, because it relies on a superficial view of both facts and law. On the facts, the Director Defendants place entirely too much emphasis on the dismissed, and now stricken, class claims. Because they have been dismissed without leave to amend, they are essentially irrelevant to the question of Plaintiffs' suitability to "vigorously and conscientiously prosecute" the derivative claims. And for the claims

13
Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

that do remain, Plaintiffs will not be forced to choose between their personal interests and those of CC-PA's creditors because those interests coincide. In any event, it appears based on the allegations that Plaintiffs seek relief on behalf of the same individuals through all of their causes of action, both class and derivative, whether that group is defined as members of a class or as CC-PA's creditors. As such, it is inconceivable how Plaintiffs can neglect their duties to represent the interests of other creditors in favor of the class, and vice versa.

Furthermore, the "fact intensive" analysis of intertwined and interrelated factors identified in Larson renders this argument, focused primarily on just two of the eight factors, a difficult one to sustain on a motion to dismiss. And though the Corporate Defendants make much of suggestions from Ninth Circuit dicta, none of the cited authorities advocate for a Rule 23.1 dismissal for lack of adequacy at the pleading stage. The one referenced district court opinion addressing a motion to dismiss, Bass v. First Pacific Networks, Inc., No. C 92-20763 JW, 1993 WL 484715 (N.D. Cal. Sept. 30, 1993), is plainly distinguishable. There, the court dismissed a derivative action brought by a shareholder who sought relief that was "clearly designed to favorably impact his own suit" against the corporation. No such facts are stated or even suggested here.

For these reasons, the dismissal of the derivative claims for conflict of interest is not required.

### iii. Failure to State a Claim

The Corporate Defendants argue the twelfth and fourteenth causes of action must be dismissed for failure to state a claim. This argument has partial success.

#### a. Twelfth Cause of Action

The twelfth cause of action, entitled "Creditor Claim for Breach of Fiduciary Duties or in the Alternative Aiding and Abetting the Director Defendants' Breaches of Fiduciary Duties," is asserted against CC-DG only. Plaintiffs allege that CC-DG is the sole owner of CC-PA, that "CC-DG exercised effective control of the CC-PA Board of Directors," and that CC-DG used its

14
Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

control "to benefit itself, as an insider, to the detriment of CC-PA and its stakeholders." SAC, at ¶¶ 282-294. Plaintiffs also allege that CC-DG owes CC-PA, and derivatively to Plaintiffs, fiduciary duties of good faith, care, and loyalty. Id.

The Corporate Defendants argue Plaintiff cannot pursue this claim on the theory that CC-DG breached any direct fiduciary duties to CC-PA because a corporate parent does not owe fiduciary duties to a wholly-owned subsidiary under Delaware law. They are correct. See Anadarko Petroloeum Corp. v. Panhandle E. Corp., 545 A.2d 1171, 1174 (Del. 1988) (holding that "a parent does not owe a fiduciary duty to its wholly owned subsidiary" because "the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders"). Plaintiffs reliance on dicta from the Delaware Court of Chancery's opinion in Trenwick America Litigation Trust v. Ernst & Young, L.L.P., 906 A.2d 168 (Del. Ch. 2011), does not persuade the court otherwise. No matter any hypothetical language in the opinion, the Trenwick court unequivocally stated that "[u]nder settled principles of Delaware law, a parent corporation does not owe fiduciary duties to its wholly owned subsidiaries or their creditors." Id. at 191. Plaintiffs have not submitted any controlling Delaware authority to the contrary. The twelfth cause of action must therefore be dismissed as a matter of law to the extent it is based on any direct fiduciary duties between CC-DG and CC-PA. And because Plaintiffs allege that CC-DG is the sole owner of CC-PA without additional minority shareholders, there is no reason to believe that additional amended allegations could save this theory.

But that does not end the matter. Plaintiffs plead an aiding and abetting theory against CC-DG in the alternative, which raises a recognized legal claim under Delaware law. See Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1038 (Del. Ch. 2006) ("[I]t is uncontroversial for parent corporations to be subjected to claims for aiding and abetting breaches of fiduciary duty committed by directors of their subsidiaries."). As to that theory, the Corporate Defendants raise arguments identical to the ones discussed in relation to Plaintiffs' standing to bring creditor derivative claims. Those arguments fail under Rule 12(b)(6) for the same reasons

they fail under Rule 12(b)(1).

The twelfth cause of action will be dismissed only to the extent it is based on a theory assuming that CC-DG owes fiduciary duties to CC-PA. The dismissal of that theory, as a matter of law, will be without leave to amend. Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1129-30 (9th Cir. 2013) ("A district court may deny leave to amend when amendment would be futile."). The cause of action will otherwise persist.

### b. Fourteenth Cause of Action

The fourteenth cause of action against CC-DG is for fraudulent transfer under California Civil Code §§ 3439.04(a)(1) and 3439.05, and Delaware Code, title 6, §§ 1304(a)(1) and 1305(a). As discussed, Plaintiffs allege they are "creditors with claims against CC-PA" under the Contract, and have "unmatured rights to payment." SAC, at ¶¶ 302-314. They also allege that CC-PA's "upstreaming" of assets was controlled by CC-DG, and was done with the intent to hinder, delay or defraud Plaintiffs. Id.

Civil Code § 3439.04(a)(1) states that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor. Similarly, Civil Code § 3439.05(a) states that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

"A transfer described in Civil Code section 3439.04, subdivision (a)(1) is characterized as actual fraud, and a transfer described in either Civil Code section 3439.04, subdivision (a)(2) or Civil Code section 3439.05 is characterized as constructive fraud." Hasso v. Hapke, 227 Cal. App. 4th 107, 122 (2014). Causes of action under the former statute are subject to Rule 9(b)'s

16
Case No.: 5:14-cv-00750-EJD
ORDER GRANTING CORPORATE DEFENDANTS' MOTION TO STRIKE; DENYING DIRECTOR DEFENDANTS' MOTION TO DISMISS; AND GRANTING IN PART AND DENYING IN PART CORPORATE DEFENDANTS' MOTION TO STRIKE

heightened pleading standard, whereas causes of action under the latter are not. See LaChapelle v. Kim, No. 15-cv-02195-JSC, 2015 WL 7753235, at *7 (N.D. Cal. Dec. 2, 2015). Regardless of the applicable pleading rule, allegations of malice, intent, knowledge, or other conditions of a person's mind can be alleged generally even when a cause of action is based in fraud. Fed. R. Civ. P. 9(b).

### 1. Civil Code § 3439.04(a)(1)

The Corporate Defendants argue Plaintiffs failed to plausibly allege actual intent under § 3439.04(a)(1). Not so.

Eleven non-exclusive "badges of fraud" can be considered to determine the presence or absence of fraudulent intent for a cause of action under § 3439.04(a)(1). Five are particularly relevant here: "[w]hether the transfer or obligation was to an insider;" "[w]hether the transfer or obligation was disclosed or concealed;" "[w]hether the transfer was of substantially all the debtor's assets;" "[w]hether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;" and "[w]hether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. Cal. Civ. Code § 3439.04(b).

Accepting Plaintiffs' allegations as true, and given that intent is excepted from Rule 9(b), the court finds the SAC describes sufficient indicia of these five "badges of fraud" to plausibly establish actual intent. First, Plaintiffs allege concealment by stating they were never informed that CC-PA intended to "upstream" their entrance fees to CC-DG, and were not informed that CC-PA would not maintain cash reserves to cover its refund obligations under the Contract. SAC, at ¶¶ 23, 55, 58, 61, 64, 68, 71. Though the Corporate Defendants theorize that notice was provided through attachments to the Contract and other documents available to Plaintiffs, the factual dispute this theory creates with the SAC's allegations cannot be resolved on this motion.

Second, Plaintiffs have also alleged the transfer of assets to an insider. Since the definition of "insider" can include "a person in control" of a corporation under Delaware law (Del. Code Ann., title 6, § 1301(7)), the SAC plausibly establishes the "upstreaming" as an insider transaction

17

1    in light of CC-DG's purported control of CC-PA. SAC, at § 304.

Third, for reasons already described, the SAC contains enough facts to plausibly establish that CC-PA transferred, if not all of its assets, at least a substantial amount at a time when CC-PA was allegedly insolvent, or that it became insolvent as a result of the "upstreaming." And there are no facts in the pleadings suggesting CC-PA received something of equivalent value in return for the transfers to Cc-DG.

Because the language of Delaware's statute is identical to that of § 3439.04, the analysis would be the same under § 1304(a). Thus, the fraudulent conveyance cause of action based on actual fraud will not be dismissed.

### 2. Civil Code § 3439.05(a)

The Corporate Defendants argue the SAC fails to establish constructive fraud under § 3439.05(a). The determination that Plaintiffs have plausibly alleged CC-PA's insolvency and have pled actual fraud under § 3439.04(a)(1) renders this argument ineffective given the similarity between the "badges of fraud" and § 3439.05(a)'s definition of constructive fraud. Accordingly, the fraudulent conveyance cause of action based on constructive fraud will not be dismissed, whether based on §3439.05(a) or the corresponding Delaware statute, § 1305(a).

## IV. ORDER

Based on the foregoing:

1. The Corporate Defendants' Motion to Strike (Dkt. No. 96) is GRANTED. Causes of Action One through Ten of the SAC are STRICKEN.

2. The Director Defendants' Motion to Dismiss (Dkt. No. 93) is DENIED.

3. The Corporate Defendants' Motion to Dismiss (Dkt. No. 95) is GRANTED IN PART and DENIED IN PART. The motion is granted such that the twelfth cause of action is DISMISSED to the extent it is based on a theory assuming that CC-DG owes fiduciary duties to CC-PA. The motion is DENIED on all other grounds.

The court schedules this action for a Case Management Conference at **10:00 a.m.**

**November 2, 2017**.  The parties shall file a Joint Case Management Conference Statement on or before **October 26, 2017**.

**IT IS SO ORDERED.**

Dated:  September 25, 2017

									  _____
									  EDWARD J. DAVILA
									  United States District Judge